313 Ga. 265
FINAL COPY

S21A1309.  WARD v. THE STATE.

NAHMIAS, Chief Justice.

Appellant Rodricus Ward was convicted of malice murder and firearm offenses in connection with the shooting death of his on-again, off-again girlfriend, Darla Gibbons. He appeals, contending that the evidence presented at his trial was insufficient to support his convictions and that the trial court erred in allowing six witnesses to testify about hearsay statements that Gibbons made to them. Appellant also argues that his trial counsel provided ineffective assistance in three ways: by failing to adequately argue against the State's motion to introduce the hearsay testimony; by failing to try to suppress all of Appellant's interview with two police detectives; and by failing to sufficiently prepare for trial. We see no reversible error, so we affirm.[1]

---

[1] Gibbons was killed in October 2014. In September 2015, a Greene County grand jury indicted Appellant for malice murder, two counts of felony

1. The evidence presented at trial showed the following. On Wednesday, October 22, 2014, a worker discovered a burned-out car with a charred human body in its trunk at a rock quarry adjacent to a local airport in Athens. The body was identified as Gibbons by dental analysis; the car was a white Buick Sentry that her mother had bought for her nine days earlier. Gibbons was killed by two gunshots to her head; two .25-caliber bullets were found in her skull. Her autopsy and a fire investigator's examination of the car indicated that the car's trunk was intentionally set on fire after Gibbons was killed.

Appellant and Gibbons had been dating on and off for about nine years. According to Gibbons's friends and family, the pair had

murder, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. At a trial from March 15 to 18, 2016, the jury found Appellant guilty of all counts. The trial court vacated both felony murder counts, merged the aggravated assault count, and sentenced Appellant to serve life in prison without parole for malice murder, five consecutive years for possession of a firearm during the commission of a felony, and five concurrent years for possession of a firearm by a convicted felon. Appellant filed a timely motion for new trial, which he amended with new counsel in December 2020. After an evidentiary hearing, the trial court denied the motion in March 2021. Appellant then filed a timely notice of appeal, and the case was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

a "rocky" relationship and argued constantly, with Appellant sometimes becoming violent. Appellant once punched Gibbons and threw her over a couch. On another occasion, while driving Appellant home, Gibbons had to pull over to the side of the road, and they got into a physical fight. In the months before her death, Gibbons told friends and family that she had been trying to collect money that she lent to Appellant, but he was evading payment. Gibbons and Appellant also fought about her recent pregnancy with their child and her subsequent miscarriage.[2]

Text messages between Gibbons and Appellant indicate that they were together for part of the weekend before her body was found (October 18 and 19). On Monday, October 20, Gibbons told her co-worker and friend, Rodney Rivers, that she was "going to call it off" with Appellant. Cell phone records and surveillance video recordings from Gibbons's apartment complex in Atlanta showed that she returned home from work at 6:36 p.m. and left again at

---

[2] This testimony from Gibbons's family and friends is discussed in more detail in Division 3 below.

7:49 p.m. A later search of her apartment showed that her toothbrush, shampoo, and soap were missing. Gibbons was scheduled to be off work on Tuesday and Wednesday.

Right after Gibbons left her apartment on Monday night, she called Appellant and spoke with him for 47 minutes, while her phone traveled east toward his residence in the Union Point area near Greensboro in Greene County. Around 9:00 p.m., Gibbons called Appellant again; her phone pinged a cell tower in the Union Point area. Gibbons's phone signal then remained stationary for about three-and-a-half hours, pinging close to Appellant's residence. At 12:45 a.m. on Tuesday, October 21, her phone began moving toward Athens. At 1:50 a.m., her phone pinged the tower serving the rock quarry area where her body was found. The phone signal disappeared at 2:17 a.m., indicating that the phone had a dead battery, was turned off, or was destroyed.

Between midnight and 1:00 a.m. on Tuesday, Appellant contacted his nephew, Marquavious Peek, and asked Peek to ride with him from Greensboro to Athens. Peek testified as follows. When

4

he arrived at Appellant's residence around 1:00 a.m., Appellant was waiting for him outside. They got into a white Buick, and Appellant drove them toward Athens. Peek did not see anyone else inside the car, but he may have seen a purse. After driving for less than an hour, Appellant stopped the car near an airport sign and told Peek to get out. Appellant drove away and then returned on foot about 40 minutes later. When Peek asked Appellant what happened to the car, Appellant said: "I had to get rid of it."[3] Peek and Appellant then walked to a mobile home park and knocked on someone's door. One of the occupants let Appellant use his phone to call Appellant's sister, Crystal Haley. Haley received this call at 1:34 a.m. and said that she would pick them up on the way to her paper route.[4] Peek

---

[3] Over the course of two pretrial interviews with law enforcement officers, Peek said that he had seen a purse on the Buick's floorboard and that Appellant told him that Gibbons had been hurt. Peek also said that once he and Appellant got to Athens, Appellant told him that there was a body in the trunk, and Peek then got out of the car. At the end of the second pretrial interview, however, Peek denied all of these statements, saying that he had "slipped up" when he made them.

[4] In a pretrial statement to police officers, Haley said that Peek had told her that Appellant and another woman found Gibbons "extremely intoxicated" at a party and took her from the party on the night Appellant called Haley. At trial, Haley testified that she only remembered Peek saying that he and Appellant had been at a party and that their ride had left them.

and Appellant walked to a gas station. At 4:03 a.m., Haley picked up Peek and Appellant. Around 5:00 a.m., after completing her paper route, Haley dropped off Appellant and Peek at Appellant's residence.

When investigators searched Appellant's bedroom on October 23, the day after Gibbons's body was discovered, they found that a section of carpet in the middle of the room was missing, and the bedding and mattress appeared to be brand new, with some tags still attached. A blood reagent indicated the presence of wiped-up blood on the floor and on a wall, with droplets going toward the door, and a blood stain, which DNA testing later confirmed to be from Gibbons, was found on an electrical cord. Investigators also found a spent .25-caliber cartridge case and an unfired .25-caliber cartridge.

During a lengthy interview with two police detectives on the day of the search, Appellant said that he and Gibbons had been dating on and off for nine years, that he "wasn't doing right" by her, that they argued a lot but he never laid hands on her, that she had been pregnant but miscarried because he had given her a sexually

6

transmitted disease ("STD"), and that she gave him $600 for his birthday and then could not pay her own rent. Appellant claimed that he had not seen Gibbons since August, but he also said that his fingerprints would be in her Buick (which she got on October 13). He provided several vague and contradictory accounts of his activities on October 20. Appellant, who was convicted of robbery in 2008, also claimed that he had not held a gun since 2010. He later allowed the detectives to take his phone and download its contents. In his phone's recently deleted photo album, the detectives found a video recorded around 8:30 p.m. on Monday, October 20, showing Appellant pointing a small-caliber pistol at the camera. The firearms examiner testified that the gun appeared to be a .22-, .25-, or .32-caliber. Appellant did not testify at trial.

2. Appellant contends that the evidence presented at his trial was constitutionally insufficient to support his convictions. We disagree. In evaluating the sufficiency of the evidence under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, we consider whether any rational jury could have

7

found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Johnson v. State*, 312 Ga. 481, 487 (863 SE2d 137) (2021). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020). When properly viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial, as summarized above, was easily sufficient to find him guilty of the crimes of which he was convicted. See *Jackson*, 443 U.S. at 319.[5]

3. Appellant contends that the trial court erred in allowing six witnesses, who were Gibbons's close friends and family, to testify

---

[5] Appellant also argues that he is entitled to a new trial under OCGA §§ 5-5-20 and 5-5-21, commonly known as the "general grounds." See *White v. State*, 293 Ga. 523, 524-525 (753 SE2d 115) (2013). However, the trial court properly considered this argument in its order denying a new trial, and "an *appellate* court does not review the merits of the general grounds. Instead, this Court's review of the trial court's ruling on the general grounds is limited to sufficiency of the evidence under *Jackson v. Virginia*." *Hinton v. State*, 312 Ga. 258, 262 (862 SE2d 320) (2021) (citation and punctuation omitted; emphasis in original). As just explained, the evidence of Appellant's guilt was sufficient to support his convictions under *Jackson v. Virginia*.

about his relationship problems with Gibbons. Appellant argues that the testimony was inappropriately admitted under OCGA § 24-8-807 ("Rule 807"), the residual exception to the hearsay rule.[6] Appellant also contends that the testimony of one of these witnesses, Brittany Griffeth, was inadmissible because the State did not give timely notice of her testimony as required by Rule 807.

At trial, Appellant's counsel objected before the first of these witnesses testified, making an argument that was somewhat confused but appeared to include the grounds that Appellant raises

---

[6] Rule 807 says:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
>> (1) The statement is offered as evidence of a material fact;
>> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
>> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
>
> However, a statement may not be admitted under this Code section unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

9

here.[7] The trial court overruled the objection. We will assume that Appellant's Rule 807 claims were properly preserved and review the trial court's decision to admit the testimony for an abuse of discretion. See *State v. Holmes*, 304 Ga. 524, 529 (820 SE2d 26) (2018). But we note that "[t]his Court is particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." Id. (citation and punctuation omitted).

(a)    The six witnesses about whom Appellant complains gave the following testimony at trial.

First, Rodney Rivers testified that he and Gibbons were co-workers and good friends; he was "like a big brother to her." Gibbons told him that she and Appellant dated on and off through college and that "[s]he really loved [Appellant] a lot." At work, Rivers

---

[7] Appellant also raises a claim of ineffective assistance of counsel based on this objection, as discussed in Division 4 (a) below.

overheard Gibbons and Appellant arguing on the phone "quite a few" times, and "she'd often mention that . . . he was real abusive and . . . all they did was argue." Rivers last saw Gibbons on October 20, when she came into his office and told him that she was "going to call it off" with Appellant.

Second, Gerald Harris testified that Gibbons was a "real good friend" from college, and he "considered her like a big sister." Gibbons told Harris that she had loaned Appellant money "to help him out," and he never paid it back.

Third, Sherrieonce Turnipseed testified that she was Gibbons's best friend. To her, it seemed like Gibbons and Appellant were always arguing. Turnipseed never observed "anything physical between them," but Gibbons told her that one time while driving, Gibbons "had to pull over to the side of the road and they got into a physical fight." In August or September 2014, Gibbons told Turnipseed that Appellant owed her a lot of money. Gibbons complained every day that she needed the money to pay her bills, and "she would call him, text him, everything, and then it got to the

11

point where he blocked her so she couldn't call, or text, or even send him messages on Facebook." Turnipseed let Gibbons use her phone and Facebook account a couple times to contact Appellant in efforts to get the money back.

Fourth, JayIvey White, who was Gibbons's cousin, testified that she and Gibbons "were more like sisters"; they grew up together and talked almost daily. JayIvey lived two minutes away from Gibbons, and they spent a lot of time together. JayIvey also spent time with Appellant and Gibbons, but Gibbons's family was not fond of Appellant. JayIvey noted that when Appellant and Gibbons's relationship "was good, it was great, and when it was bad, it was terrible." According to JayIvey, at first Gibbons was not excited about her pregnancy by Appellant, "but she felt that she owed him a baby, so she was going to try to keep it this time."[8] Appellant seemed excited in the beginning and said he was going to be supportive, but that changed. They argued about the pregnancy, and

---

[8] In his police interview, Appellant mentioned that he and Gibbons had lost two prior pregnancies.

when she lost the baby, "he blamed her for it," even though "it was because he gave her an STD and caused the miscarriage." Gibbons also told JayIvey about a violent fight that occurred "about maybe a month before [she died]," during which Gibbons scratched Appellant and "he punched her and threw her over her couch, and he called the police on her." When JayIvey saw a bruise on Gibbons's arm, Gibbons said that "there had been other times, but [Gibbons] didn't go into any detail." JayIvey also testified that Gibbons lent Appellant $1,200 in May 2014. When Gibbons asked for $900 back to pay her bills, Appellant never paid her. About a week before Gibbons's death, she told JayIvey that she did not want to speak to Appellant anymore and that she did not like him.

Fifth, JayIvey's husband, Michael White, testified that before Gibbons's death, he saw her at least every other day. Gibbons asked him to talk to Appellant because they had relationship issues and she wanted to make it work. He saw Gibbons showing his wife bruises once around the end of July 2014. He also fixed Gibbons's blinds after they were torn down "because of an altercation that

[Gibbons and Appellant] had" in which she went over the back of a couch.

Sixth and finally, Griffeth testified that she and Gibbons "grew up in church together." Since college, they continued their friendship "mainly on the phone." She first thought that Appellant was "a sweet guy," but with time she realized that Appellant and Gibbons were "argumentative" with each other. When Gibbons had her miscarriage, she was in emotional distress and told Griffeth that she felt Appellant "was blaming her for it." Gibbons also told Griffeth that in college, "there was a gun pulled on her [by Appellant], but it wasn't used, of course[.]"

(b)   Appellant first argues that the State did not prove that the statements by Gibbons that these witnesses repeated had sufficient "guarantees of trustworthiness" and were "more probative" than other evidence that reasonably could have been procured, as Rule 807 requires.

"Statements admissible under Rule 807 are considered sufficiently trustworthy not because of the credibility of the witness

reporting them in court, but because of the circumstances under which they were originally made." *Rawls v. State*, 310 Ga. 209, 214 (850 SE2d 90) (2020) (citation and punctuation omitted).[9] Here, the circumstances of Gibbons's statements, namely that they were statements about abuse and problems in her romantic relationship made to close friends and family, demonstrate sufficient guarantees of trustworthiness under Rule 807. See *Rawls*, 310 Ga. at 215 (holding that the victim's "close relationship with each of these witnesses gave her statements to them about the abuse she was experiencing from her boyfriend sufficient guarantees of trustworthiness to be admissible under Rule 807"). See also *Merritt v. State*, 311 Ga. 875, 887 (860 SE2d 455) (2021) ("[A] victim's description of prior acts of domestic violence against her to her family and friends carries an increased level of trustworthiness."); *Jacobs v. State*, 303 Ga. 245, 250-251 (811 SE2d 372) (2018) (concluding that statements and text messages from the murder

---

[9] We note that to the extent the witnesses' testimony was based on their own observations of the couple's interactions and of Gibbons's physical injuries, such as her bruises, that evidence was not hearsay. See *Rawls*, 310 Ga. at 216.

victim to her close friends and confidants describing the nature of her relationship with the appellant as well as his "abusive, controlling, and violent behavior toward [the victim]" had the requisite guarantees of trustworthiness).

In addition, the witnesses' testimony about Gibbons and Appellant's relationship troubles was highly probative as to his motive for shooting and killing his longtime girlfriend. See *Rawls*, 310 Ga. at 215 (holding that testimony about the defendant's prior violent acts against his girlfriend showed "the nature of the relationship between [the defendant] and the victim [and] shed[ ] light on [the defendant]'s motive in committing the offenses charged" (citation and punctuation omitted)). Appellant suggests that the State could have used police reports and medical records, instead of the hearsay testimony, to prove that Gibbons miscarried, had an STD, and suffered abuse. But even assuming that such evidence exists and would have been admissible, Appellant has not shown that it would have been as probative of the nature of Gibbons and Appellant's relationship as the statements she made to her close

confidants. See id. See also *Smart v. State*, 299 Ga. 414, 422 (788 SE2d 442) (2016) (explaining that "in light of the often-secretive nature of domestic violence," statements from a murder victim to her friends and family describing acts of domestic violence can be "highly probative"). For these reasons, the trial court did not abuse its discretion in admitting the challenged hearsay testimony — except perhaps for the testimony of Griffeth, which we will discuss next.

(c)    Appellant argues that Griffeth's testimony should have been excluded because he was not given notice of it "in advance of the trial," as Rule 807 requires. On the second day of trial, the State filed a supplemental notice to add the hearsay statements from Griffeth; she testified two days later, on the last day of trial, giving the testimony summarized in Division 3 (a) above.

Pretermitting whether the trial court abused its discretion by admitting Griffeth's testimony because the State's notice was

untimely, any such error was harmless.[10] A nonconstitutional

evidentiary error "is harmless if it is highly probable that the error

did not contribute to the verdict." *Adkins v. State*, 301 Ga. 153, 158

(800 SE2d 341) (2017). Griffeth's testimony was largely cumulative

of the properly admitted testimony of the other witnesses. And

although Griffeth was the only one of Gibbons's confidants to testify

that Gibbons said that Appellant once "pulled [a gun] on her" back in

college, the jury had already heard about at least two other incidents

of Appellant's violence against Gibbons, the jury had seen a video of

Appellant holding a gun around the time of the murder, and the

overall evidence of Appellant's guilt was strong. Thus, it is highly

probable that Griffeth's testimony did not contribute to the verdict.

See *Rawls*, 310 Ga. at 216 (explaining, under plain-error review, that

"Appellant has not shown that [the witness's] testimony about one

---

[10] This Court has noted that under Eleventh Circuit precedent, to which we look for guidance given the similarity between OCGA § 24-8-807 and Federal Rule of Evidence 807, "failure to provide pretrial notice of Rule 807 evidence is not fatal if the defendant is not harmed by the lack of notice and had a fair opportunity to address the statements." *Thompson v. State*, 302 Ga. 533, 545 (807 SE2d 899) (2017). But we left "for another day the determination of what constitutes 'harm' and 'fair opportunity' within the context of Rule 807." *Thompson*, 302 Ga. at 545. We will do the same here.

more physical fight between Appellant and [his murdered girlfriend] probably affected the outcome of the trial"); *Anglin v. State*, 302 Ga. 333, 336 (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced.").

4. Appellant contends that his trial counsel provided constitutionally ineffective assistance in three ways. To prevail on these claims, Appellant must show both that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficient performance, Appellant must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Rawls*, 310 Ga. at 220. To prove prejudice, Appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. See also *Rawls*, 310 Ga. at 220.

19

(a) Appellant first contends that his trial counsel was ineffective in making only a "tepid" argument that, under Rule 807, the State was required to show that the hearsay testimony discussed in Division 3 above was more probative than any other evidence that could reasonably be procured. However, as explained in that division, in which we assumed that trial counsel properly preserved Appellant's claims, the evidence met this Rule 807 requirement. Appellant has not specified what else his trial counsel supposedly should have argued that would have altered this conclusion.[11] Thus, this ineffective-assistance claim fails. See *Stuckey v. State*, 301 Ga. 767, 773 (804 SE2d 76) (2017) ("Failure to make a meritless objection cannot be considered deficient or prejudicial."). See also *Washington v. State*, 312 Ga. 495, 503 (863 SE2d 109) (2021)

---

[11] To the extent Appellant argues that his trial counsel performed deficiently by failing to contend that Rule 807 requires the trial court to make an explicit finding about the hearsay evidence's probative value, Appellant's argument fails because we have held that "[n]othing in [Rule 807] requires a trial court to make on-the-record determinations" about each of the rule's requirements before admitting hearsay under the rule. *Smith v. State*, 311 Ga. 288, 291 (857 SE2d 698) (2021). And as discussed above, the trial court did not abuse its discretion in ruling, albeit without making specific findings, that this requirement of Rule 807 was met.

("[D]eficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." (citation and punctuation omitted)); *Brown v. State*, 303 Ga. 617, 621 (814 SE2d 364) (2018) (holding that trial counsel's performance was not deficient in allegedly failing to cross-examine a witness about a particular issue when counsel did explore that issue on cross-examination and the appellant presented no argument as to how counsel could have better developed that issue).

(b)  Appellant also contends that his trial counsel provided ineffective assistance by failing to argue that Appellant's full interview with two detectives on October 23, 2014, should have been suppressed because it was custodial from the beginning but Appellant was not warned of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), until about four hours into the interview.[12] The record, however, shows that the

---

[12] Appellant's trial counsel did seek to suppress statements that Appellant made in the interview after he allegedly invoked his right to counsel (which was about an hour after he was read the *Miranda* warnings). The trial court held a *Jackson-Denno* hearing, see *Jackson v. Denno*, 378 U.S. 368 (84

interview was not custodial at the beginning, and Appellant was given the *Miranda* warnings when it became custodial.

Appellant was interviewed by Detectives Richard Boyle and Chris Brogden. They approached Appellant at a vigil held at Gibbons's mother's house in Athens, and Appellant agreed to drive to the police station in his mother's car to discuss Gibbons's whereabouts. The interview room was at the back of the police station. Although the door was not locked, the room was monitored from a "bullpen" area right outside.[13] The interview began at 12:30 p.m. and lasted about nine hours, including some lengthy breaks.[14] During the interview, Appellant was not restrained, and he was given food and water as well as bathroom and cigarette breaks. During the breaks, he left the room accompanied by an

---

SCt 1774, 12 LE2d 908) (1964), at which the two interviewing detectives testified and the video-recorded interview was admitted into evidence. The trial court ruled that the statements made after Appellant's alleged invocation of counsel were admissible, but the State ultimately chose not to offer those statements into evidence at trial.

[13] It is not clear from the record if the door was kept closed during the interview.

[14] The video recording of the interview lasts about 11 hours, but during the last two hours, the detectives did not question Appellant.

officer.

At the start of the interview, Detective Boyle told Appellant that the investigation was in its infancy and that the detectives were just gathering information. Appellant was not read the *Miranda* warnings at that point. Over the next four hours, Appellant shared the information discussed in Division 1 above, and he gave the detectives permission to examine and download the contents of his cell phone. After Appellant repeatedly contradicted himself as well as other evidence, including his text messages, Detective Boyle informed him that "the pretense [of the conversation] had changed . . . [to] an in-custody interview" and that "right now [he was] not free to leave." Detective Boyle then read Appellant the *Miranda* warnings, which Appellant said he understood. The detectives then resumed questioning Appellant for about five more hours, stopping when he said, "Now I will need my lawyer; I would like a lawyer now."

A person is deemed to be in custody, requiring *Miranda* warnings before interrogation, when he is "(1) formally arrested or

(2) restrained to the degree associated with a formal arrest." *DeVaughn v. State*, 296 Ga. 475, 479 (769 SE2d 70) (2015) (citation and punctuation omitted). "Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." Id. (citation and punctuation omitted). The record here supports a finding that Appellant's interview, to which he drove himself and which was conducted while he was unrestrained in an unlocked room that he occasionally left for breaks, was not custodial until Detective Boyle told him that he was no longer free to leave and read him the *Miranda* warnings. See, e.g., *Drake v. State*, 296 Ga. 286, 289-290 (766 SE2d 447) (2014) (concluding that a defendant was not in custody during the initial part of a series of video-recorded interviews when he willingly agreed to accompany officers to the police station, was initially told that he was not under arrest, was given food and water, and was not handcuffed or physically restrained until the police decided to arrest him and read him the *Miranda* warnings after he provided shifting accounts); *Leslie v. State*, 292 Ga. 368, 372 (738 SE2d 42) (2013)

24

(concluding that a defendant was not in custody, and the police were not required to give him the *Miranda* warnings before starting to question him, when he drove himself to the police station, spoke with the investigator in an unlocked interview room, was not restrained, and was free to leave).

Thus, a motion to suppress the entire interview on the ground now proposed by Appellant would not clearly have succeeded, and his trial counsel was not ineffective in failing to make such a motion. See *Evans v. State*, 308 Ga. 582, 586 (842 SE2d 837) (2020) ("Where, as here, [a defendant] claims that trial counsel was deficient for failing to file a motion to suppress, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." (citation and punctuation omitted)).

(c)  Appellant's final ineffective assistance claim is based on his trial counsel's alleged overall failure to prepare for trial. Although Appellant argues generally that his trial counsel failed to review discovery, misrepresented Georgia law, refused to question

lay witnesses, and failed to question the credentials of the State's expert witnesses, Appellant does not identify any specific instances to support these broad allegations. Instead, the record and trial counsel's testimony at the motion for new trial hearing show that counsel reviewed discovery with Appellant, filed a successful motion to suppress bad character evidence, and cross-examined the witnesses. Thus, Appellant has failed to demonstrate either deficient performance or prejudice. See *Lane v. State*, 299 Ga. 791, 795-796 (792 SE2d 378) (2016) ("[Appellant] presents no evidence, or even assertion, as to what further investigation or preparation might have produced that would have made a difference in the outcome of his trial. Consequently, [Appellant] fails to show ineffective assistance of trial counsel on this ground."); *Tepanca v. State*, 297 Ga. 47, 51 (771 SE2d 879) (2015) ("[Appellant] leaves this Court to engage in a guessing game as to how appellate counsel's representation, or rather lack thereof, might have amounted to ineffective assistance. Under these circumstances, [Appellant] has failed to show even a possibility of ineffective assistance[.]").

*Judgment affirmed. All the Justices concur.*

Decided February 15, 2022.

Murder. Greene Superior Court. Before Judge Trammell.

*The Abt Law Firm, E. Jay Abt; The Hingerty Law Firm, Katie A. H. Borodin*, for appellant.

*T. Wright Barksdale, District Attorney, Allison T. Mauldin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.