314 Ga. 709
FINAL COPY

S22A0578.  PEACOCK v. THE STATE.

PINSON, Justice.

Jeffrey Peacock was convicted of five counts of malice murder and other crimes related to the shooting deaths of Jonathan Edwards, Jr., Alecia Norman, Reid Williams, Jones Pidcock, and Jordan Croft; the burning of their home; and the killing of three dogs. On appeal, he contends that (1) the evidence presented at trial was insufficient to sustain his convictions for malice murder and the associated possession of a firearm during the commission of a felony; (2) the trial court erred in denying his motion to suppress evidence found during the search of his truck; (3) his trial counsel provided ineffective assistance by failing to seek to suppress his statements to a GBI agent who allegedly provided him a hope of benefit in violation of OCGA § 24-8-824; and (4) his cruelty-to-animals convictions and sentences should have been for misdemeanors

rather than felonies based on the rule of lenity.[1]

We affirm. First, the evidence presented at trial was sufficient to support Peacock's convictions under OCGA § 24-14-6 and as a matter of constitutional due process. Second, the trial court did not abuse its discretion by denying Peacock's motion to suppress evidence obtained from his truck under a search warrant for the home because the truck was parked in the home's curtilage. Third, Peacock's trial counsel did not provide ineffective assistance by choosing not to raise a meritless hope-of-benefit argument. And

---

[1] The crimes occurred on May 15, 2016. In March 2017, a Colquitt County grand jury indicted Peacock for five counts of malice murder, five counts of possession of a firearm during the commission of a felony, arson, and three counts of aggravated cruelty to animals. The State filed a notice of intent to seek the death penalty, which the State later withdrew after Peacock waived his right to a jury trial. At a bench trial from June 17 to 20, 2019, the court found Peacock guilty of all charges. The court sentenced him to serve life in prison without parole for each murder conviction, five years in prison for one firearm conviction, 20 years in prison for arson, and five years in prison for each animal-cruelty conviction. The court merged the remaining firearm counts; the State has not challenged those mergers, and we will not raise sua sponte any error that benefitted Peacock. See *Dixon v. State*, 302 Ga. 691, 696-698 (808 SE2d 696) (2017). Peacock timely moved for a new trial, which he later amended twice with new counsel. In November 2021, after an evidentiary hearing, the trial court denied Peacock's motion. He filed a timely notice of appeal, and the case was docketed to the April 2022 term of this Court and orally argued on May 19, 2022.

finally, the rule of lenity does not apply in this case because aggravated cruelty to animals and cruelty to animals do not address the same criminal conduct.

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. At 8:33 a.m. on May 15, 2016, Peacock called 911 and reported that his friends' house was "fully engulfed" in flames and his friends were inside.[2] Peacock explained that he had left the house about 30 minutes earlier to get breakfast for everyone, and when he returned, the house was on fire.

After firefighters extinguished the fire, which had destroyed most of the house, they found the burned bodies of all five victims inside. Each of them had been killed by a gunshot to the head: Norman was shot twice, Croft was shot at least once (his head was too damaged by the fire to determine if he had been shot again), and the other three victims were shot once. The medical examiner

---

[2] Edwards was renting the house. His girlfriend, Norman, and their friend Williams also lived in the house. Peacock, Pidcock, and Croft often visited and sometimes slept over, including on the night before the fire.

testified that each victim would have died within minutes of being shot, and they were all dead before the fire began. Bullets found in the bodies of Edwards, Norman, and Pidcock were fired from Edwards's gun, which was found in his bedroom after the fire. (No bullets were recovered from the bodies of Williams and Croft. According to Peacock, Edwards usually kept his gun in his bedroom.) The bodies of two dogs, which had died from smoke inhalation and severe burns, were also found in the house. These dogs belonged to Edwards and Norman and usually stayed inside. Edwards and Norman also had a skittish dog that tended to stay outside. The body of that dog was found under Edwards's truck behind the house. The dog had some burns around its mouth and soot in its airway, but the dog had been killed by its skull being crushed, not by the fire.

(b) After calling 911, Peacock stayed near the house, and Colquitt County Sheriff's Office Investigator Mike Murfin questioned him about his connection to the victims. Peacock told the investigator that he used to live at the house; that he was often at the house, including the night before, when he and the five victims

4

had been drinking and smoking marijuana together; that he went to sleep around midnight and woke up around 7:30 a.m.; that everyone was gathered in Edwards's room watching a show on Netflix when he left to get everyone breakfast at a Hardee's restaurant and to pick up cigarettes at a convenience store; and that the house was on fire when he returned.

Peacock consented to an officer searching his pickup truck, which he had driven to the house, for the purpose of looking for the Hardee's bag and cigarettes. Investigator Murfin's brief search corroborated that Peacock had Hardee's biscuits and a new pack of cigarettes. A surveillance video recording showed that Peacock had ordered the biscuits at the Hardee's around 8:15 a.m. Surveillance video recordings from the convenience store, however, showed that Peacock did not visit the store that morning, and Netflix records showed no activity that morning on the account that Edwards used. The Hardee's surveillance video also showed that Peacock was wearing a green shirt with white writing when he stopped at the restaurant; he was wearing a blue-gray sleeveless shirt when he

5

spoke to Investigator Murfin. When officers conducted a second, more thorough search of Peacock's truck under a search warrant, they found a green shirt with white writing and khaki shorts stuffed behind a speaker at the back of the truck. The shirt and shorts were blood-stained, and DNA analysis revealed that blood on the shirt belonged to Croft and blood on the shorts belonged to Norman, Pidcock, and a non-human source. Another blood stain on the shirt had DNA from at least three people, but the profile was too complex to identify them.

(c) Three days after the fire, Peacock was interviewed for about seven hours by GBI Special Agent Jason Seacrist. Peacock initially told the agent that he, the five victims, and Mika Snipes spent time together at the house on the night before the fire, drinking and talking; Peacock took Snipes home around 12:00 a.m.; and shortly after he returned, everyone went to sleep.[3] Peacock then repeated

---

[3] Snipes corroborated that Peacock took her home. She testified that the night was "really calm," and when she left, Edwards and Norman were in bed, Williams was getting in the shower, Pidcock was asleep in a chair, and she did not know where Croft was.

the story he had told Investigator Murfin about everyone watching Netflix while he drove to get breakfast and cigarettes. After almost four hours, during which Peacock stuck to this story, he was arrested for the murders.

Shortly after his arrest, Peacock changed his story and gave the following account. When he returned from dropping off Snipes, the front door of the house was locked, and when he went around to the back of the house, he found Croft in the kitchen. He assumed everyone else was asleep. He and Croft stayed in the kitchen, drinking and then doing some cocaine that Croft had.[4] Peacock began to feel strange from the cocaine and went into the hallway, where he found Pidcock's body. He then found the bodies of Williams, Edwards, and Norman lying face down in their bedrooms.[5]

---

[4] Peacock first said that he and Croft stayed on the porch, but when repeating his account in more detail, he said that they were in the kitchen. Peacock said that Croft got the cocaine from "Blow," a drug dealer who lived in Indian Lakes. Investigator Murfin testified that he had confirmed the existence of this drug dealer. Blood tests showed that Edwards, Williams, Pidcock, and Croft had all used cocaine some time before their deaths, but Croft had used it more recently than the others.

[5] Peacock said that he briefly held Norman and turned over each of the three men to check for a pulse and listen for breathing. Agent Seacrist,

Peacock confronted Croft, who offered no explanation for the shootings, and they began to fight.[6] When Croft pulled a gun from his pants, Peacock grabbed it and shot Croft twice in the head. After drinking and smoking marijuana for a couple hours, Peacock decided to set the house on fire "to cover it up." He knew that Edwards and Norman had three dogs, and he had seen the two dogs that usually stayed inside on the porch before he took Snipes home. He did not see any of the dogs when he set the fire, but he left the home's front door open.

(d) Peacock also told Agent Seacrist that he used to live in the house, but after his girlfriend died, he began to use a drug called spice, which was against the house rules. Edwards spoke to Peacock's father, and they agreed that Peacock should move in with his father. Snipes corroborated Peacock's story that he had been kicked out of the house because of drug use; she also acknowledged

---

however, testified that the three men's bodies were found lying face down.

[6] Peacock said that he did not know why Croft would have shot their friends, but sometimes the group would pick on Croft. Croft usually laughed about it, but sometimes the group "took stuff too far."

that other people in the group would still use drugs sometimes, including smoking marijuana and using cocaine on the night of May 13, two days before the fire. She further testified that when Peacock was kicked out of the house, she, Pidcock, and Croft were also told they could not come to the house, but everyone had eventually been allowed back. Peacock started coming around the house again a few weeks before the fire. Everyone appeared friendly, but shortly after Peacock rejoined the group, Norman told Snipes and Edwards that she did not feel "safe" with Peacock at the house.

Another person who spent time with the group, Ben Littleton, testified that Peacock had been kicked out of the house because of "issues with drugs or drinking," but he acknowledged that Peacock was not the only one using drugs. Littleton also testified that when he and the five victims were together on May 13, Edwards said that he wanted to vote about whether to "kick [Peacock] out and not hang out with him anymore," and everyone voted to "kick [Peacock] out" of the group because of "the things" he was doing, including "some other types of drugs." Littleton did not know if anyone had told

Peacock about the vote.

2. Peacock contends that the evidence presented at trial was insufficient to support his convictions for murder and the associated firearm possession count under OCGA § 24-14-6 and as a matter of constitutional due process, see *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).[7]

(a) The evidence presented to show that Peacock committed some of the charged crimes, including four of the murders, was circumstantial. Under OCGA § 24-14-6, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Whether a hypothesis raised by the defendant is reasonable is a question committed principally to the factfinder. See *Smith v. State*, 307 Ga.

---

[7] Peacock contends that the evidence was insufficient under statutory and constitutional law to support the guilty verdicts for all five counts of possession of a firearm during the commission of a felony, but the trial court merged four of those counts, making his contention as to those counts moot. See *Fortson v. State*, 313 Ga. 203, 209 (869 SE2d 432) (2022). Peacock does not challenge the sufficiency of the evidence supporting his convictions for arson and aggravated cruelty to animals.

680, 684 (838 SE2d 321) (2020). Having "heard the witnesses and observed them testify," the factfinder is in a better position than a reviewing court to determine the reasonableness of the hypothesis produced by the evidence or lack thereof. *Porter v. State*, 358 Ga. App. 442, 443 (855 SE2d 657) (2021). Peacock raises the hypothesis that Croft killed four of the victims, and then Peacock killed Croft in self-defense or committed voluntary manslaughter because he was provoked to kill Croft for killing his friends.[8] But the evidence was sufficient for the factfinder to reject this hypothesis as unreasonable. Peacock initially told Investigator Murfin and then Agent Seacrist that he drove up to the house on fire with his friends already dead, a story that was contradicted by Netflix records and the gas station surveillance video. After he was arrested for the murders, Peacock

---

[8] See OCGA §§ 16-3-21 (a) ("[A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony."); 16-5-2 (a) ("A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]").

11

changed his story: he said he had spent significant time with Croft before finding out that Croft killed their friends (for no apparent reason), and after finding their bodies and killing Croft, he set the home on fire and hid his bloody clothes inside his truck. Given his shifting stories that conflicted with other evidence and viewing the evidence as a whole, the factfinder was authorized to reject Peacock's alternative hypothesis as unreasonable. See *Long v. State*, 309 Ga. 721, 726 (848 SE2d 91) (2020) (holding that the evidence was sufficient for the jury to reject as unreasonable the hypothesis that the appellant's boyfriend killed the victim, noting among other things that the appellant changed her story several times, each time giving accounts that were dubious in light of the physical and medical evidence).

(b) To evaluate a challenge to the sufficiency of the evidence as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was

12

convicted." *Butler v. State*, 313 Ga. 675, 678-679 (872 SE2d 722) (2022) (citations and punctuation omitted). See also *Jackson*, 443 U.S. at 319. When viewed in this light, the evidence summarized above was sufficient for a rational trier of fact to find Peacock guilty beyond a reasonable doubt of the five counts of malice murder and the related firearm possession count of which he was convicted.

3. Peacock next contends that the trial court erred by denying his motion to suppress the search of his truck, which was conducted under a search warrant for the home on the day of the fire. We review the trial court's decision on a motion to suppress for abuse of discretion. See *Glenn v. State*, 308 Ga. 310, 311 (840 SE2d 368) (2020).

(a) On the day of the fire, GBI Special Agent Bahan Rich procured a search warrant authorizing the search of "[t]he entire premises and curtilage to include vehicles located at 505 Rossman Dairy Road in Moultrie, Colquitt Co., GA, said premises is described as a single-story dwelling with extensive fire damage." The proposed search sought evidence of arson, murder, and violations of Georgia's

Controlled Substances Act. The affidavit supporting the search warrant said, among other things, that Peacock "reported that last night several of the victims smoked marijuana from a pipe which belonged to one of the victims" and that "[v]ehicles believed to belong to said victims remain on scene and were damaged by the structural fire." As part of the search conducted based on this warrant, Agent Seacrist searched Peacock's truck and found Peacock's green shirt and khaki shorts with blood stains.

Before trial, Peacock moved to suppress the results of this search, arguing that there was not probable cause to support a search warrant for the truck and that the truck was not within the curtilage of the home. At the hearing on the motion, Investigator Murfin testified that when emergency personnel arrived at the home, Peacock's truck had been parked in the home's driveway, but emergency personnel moved the truck farther away from the home to allow them easier access to the home. The truck was at this location when the affidavit for the search warrant was written and when the search was conducted pursuant to the warrant. The

14

investigator also testified that Peacock was free to leave the scene, but his truck was not.

During his hearing testimony, Investigator Murfin described the truck's location as "at the edge of the pecan orchard" but still "in the yard" and within the crime scene tape that was used to secure the scene. An aerial photograph of the property showed that the home had an open dirt area in front of it, and that the open area amounted to only a portion of the property, which was 1.17 acres in total according to the tax record admitted into evidence. The rest of the property was covered in trees, and the home and open area were bordered on all four sides by trees, with an opening to access the main road and a field road. Investigator Murfin's testimony and other photographs showed that Peacock's truck was parked along the tree line on the right side of the open area (if facing toward the road), a short distance from the front of the home. Photographs showed that a fire truck and other vehicles, which Investigator Murfin described as belonging to investigators and first responders, were parked to the left and right of Peacock's truck.

The trial court denied Peacock's motion to suppress, finding that Peacock's truck was within the curtilage before and after it was moved and that the warrant was a valid search warrant that authorized the search of the truck. The trial court reached the same conclusion when reviewing the issue in Peacock's motion for new trial.[9]

(b) The Fourth Amendment to the U.S. Constitution requires search warrants to be supported by probable cause and to "particularly describe the place to be searched." Peacock contends that the search warrant here did not authorize the search of his truck because the warrant affidavit failed to mention his green

---

[9] On appeal, Peacock also argues that the search of his truck was derivative of law enforcement officers unlawfully seizing his truck by participating in the movement of his truck from the house's driveway and refusing to let him leave the scene with his truck before they obtained a search warrant. Even assuming Peacock raised this argument with sufficient clarity in the trial court to preserve ordinary appellate review, it fails because the evidence does not support it. As discussed above, Investigator Murfin testified that first responders moved Peacock's truck to gain better access to the house; law enforcement did not move the truck to secure it or facilitate its search. And when asked whether Peacock's truck was "free to leave," Investigator Murfin testified that "it was not," but there was no evidence that he shared this with Peacock or that they otherwise refused to let him leave with the truck before they obtained the search warrant. In short, the factual premise for this argument is not supported by the evidence.

16

Chevrolet truck at all (it mentioned only the victims' vehicles), much less demonstrate probable cause to believe that any evidence of the listed crimes was in his (not mentioned) truck.

These arguments ignore that the warrant here authorized a search of the home. And in *McLeod v. State*, 297 Ga. 99, 105 (772 SE2d 641) (2015), we held that a warrant that authorizes the search of a home also authorizes the search of "[v]ehicles parked within the curtilage of [the] dwelling," regardless of whether the warrant specifies the particular vehicle or any connection between the vehicle and the crimes.[10] Although we have not explained why such a warrant meets the Fourth Amendment's particularity requirement as to the vehicle, other courts have. See, e.g., *United States v. Evans*, 92 F3d 540, 543-544 (7th Cir. 1996); *Massey v. Commonwealth*, 305 SW2d 755, 756 (Ky. 1957). These courts liken

---

[10] This appears to be the majority rule. See 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.10 (c) Vehicles on or near described premises (6th ed.) (explaining that "[i]t has often been held that a search warrant authorizing the search of certain premises covers automobiles found on those premises, provided of course that the place searched in the vehicle could contain one of the items described in the search warrant," and collecting cases).

17

vehicles parked on the premises to desks, cabinets, closets, or "any other item of personal property" in which the items described in the search warrant might be stored. *Massey*, 305 SW2d at 756. And it is well settled that a search warrant for a home authorizes searching those containers without separately identifying them with particularity. See *United States v. Ross*, 456 U.S. 798, 820-821 (102 SCt 2157, 72 LE2d 572) (1982).

There is a wrinkle to this analysis, however, when the vehicle in question is owned by a visitor. Although a warrant to search a home generally authorizes searching personal effects and containers without separately identifying them, such a warrant does not authorize searching a visitor merely because he is found at the home when the warrant is executed. See *Ybarra v. Illinois*, 444 U.S. 85, 92 & n.4 (100 SCt 338, 62 LE2d 238) (1979) (reasoning that this conclusion follows from the Fourth Amendment's prohibition against open-ended or general warrants). In a similar vein, some courts faced with the question here—whether a warrant to search a home authorizes searching a vehicle on the premises—have

18

distinguished between vehicles of mere visitors and those owned by someone with some stronger relationship to the premises or to the criminal activities in question, and would uphold a search only in the latter circumstance. See *Evans*, 92 F3d at 543-544 (holding that, regardless of ownership, a vehicle on the home's curtilage may be searched pursuant to the search warrant for the house "unless it obviously belonged to someone wholly uninvolved in the criminal activities going on in the house"); *United States v. Sturmoski*, 971 F2d 452, 458 (10th Cir. 1992) (explaining that "the scope of the warrant includes those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled" and concluding that a horse trailer sitting on the curtilage with a path connecting it to an office trailer on the premises to be searched "provided reasonable indicia of control over the [horse trailer]" (citation and punctuation omitted)). But see *United States v. Cole*, 628 F2d 897, 899 (5th Cir. 1980) (holding over a dissent that the "appellant's

19

truck, parked in a carport attached to the rear apartment, was within the scope of the warrant" to search the premises, even though the appellant was a visitor who drove up to the apartment as the police officers arrived to conduct the search).

This question—whether, to be searched under a warrant for a home, a vehicle must have some connection beyond mere proximity to the home or crimes—was not presented when we decided *McLeod*, because the owner of the vehicle searched there was also the owner of the home. The better rule may be to require some greater connection than mere proximity to the home or crimes, because a warrant to search a home that also allows searching vehicles of casual visitors unconnected with the home or the basis for the search looks a lot like a forbidden general warrant. Cf. *Ybarra*, 444 U.S. at 92 & n.4. See also Wayne R. LaFave et al., Search & Seizure § 4.10 (c) (6th ed. Dec. 2021 update) (advocating for limiting authorization via search warrant for the home to searching "vehicles under the control (actual or apparent) of the person whose premises are described" and canvassing cases (footnotes omitted)). Our Court of

20

Appeals discussed such a rule long before we decided *McLeod*. See *Blount v. State*, 181 Ga. App. 330, 335-336 (352 SE2d 220) (1986) (recognizing that a person's "automobile[ ] cannot be searched merely because he is a visitor upon searched premises" but upholding the search of the defendant's wife's car because there was "a sufficient 'connection' between [her] and the very drug-related criminal activities that existed on 'the premises' then being lawfully searched," so she "was not a mere visitor or passerby whose privacy was invaded during the execution of the warrant" (cleaned up)).

But we need not decide whether to adopt that limiting rule (or some version of it) here, because Peacock was far from an unexpected or one-time visitor who drove up during the search in this case. Peacock used to live at the home, was still closely associated with those who did, and was a frequent guest. He had also spent the night before at the home drinking and smoking marijuana with the victims, slept there, left shortly before the fire to get breakfast for the victims, and returned to the home and parked his truck in the home's driveway. This evidence, which

21

Investigator Murfin knew at the time law enforcement officers sought and secured the search warrant, connects Peacock and his truck quite closely with the home and the crimes being investigated. Under these circumstances, a valid search warrant for the home authorized searching his truck if the truck was in the curtilage.[11]

(c) But this does not end the inquiry. Peacock contends that the warrant to search the home still did not authorize searching his truck because the truck was not within the home's curtilage when it was searched. See *McLeod*, 297 Ga. at 105 (holding that a warrant authorizing the search of a home authorizes the search of "[v]ehicles *parked within the curtilage* of [the] dwelling" (emphasis added)).

(i) The curtilage of a home is "the area immediately surrounding and associated with the home." *Collins v. Virginia*, __ U. S. __ (138 SCt 1663, 1670, 201 LE2d 9) (2018). A home's curtilage has long been protected as "part of the home itself for Fourth

---

[11] Because we conclude that the search warrant for the home authorized searching Peacock's truck if it was in the curtilage, we need not address whether the warrant's inclusion of the vehicles located on the premises satisfied the particularity requirement as to Peacock's truck.

22

Amendment purposes" to preserve a person's "right . . . to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (133 SCt 1409, 185 LE2d 495) (2013). "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." Id.

These reasons for treating the curtilage as part of the home help us identify the curtilage in a given case. The basic question is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 301 (107 SCt 1134, 94 LE2d 326) (1987) (citation and punctuation omitted). Bearing on that question are factors like "proximity" of the area claimed as curtilage, whether that area is "within an enclosure surrounding the home," the "nature of the uses to which the area is put," and any "steps taken

23

by the resident to protect the area from observation by people passing by." Id. That said, the "conception defining the curtilage is . . . familiar enough that it is easily understood from our daily experience," *Jardines*, 569 U.S. at 7, and "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration," *Dunn,* 480 U.S. at 301.

(ii) Applying those principles here, we conclude that the trial court did not abuse its discretion in ruling that Peacock's truck sat within the curtilage of the home when it was searched. Even after the first responders moved the truck, it was parked within the open area that Investigator Murfin described as the "yard" in front of the home, which is bordered along with the house by trees on all sides. See *Rivers v. State*, 287 Ga. App. 632, 634 (653 SE2d 78) (2007) (holding that "the hedge area adjacent to the house" on the side of the house "approximately 20 feet from the front entrance" was within the house's curtilage).[12] Although the record does not specify

---

[12] Before the first responders moved the truck, it was in the driveway to the home, which was plainly within the curtilage. See *Landers v. State*, 250

24

the precise size of that area or the distance from its boundaries to the home, the area covered only a confined part of the 1.17-acre property. And its boundary, the tree line that the truck sat inside of, was close enough to the home that first responders, including a fire truck, parked there in responding to the house fire. That area was "immediately surrounding" the house, *Collins*, 138 SCt at 1670, in the same apparent proximity and vicinity as porches, yards, and gardens that are routinely considered curtilage. See, e.g., *United States v. Alexander*, 888 F3d 628, 633 (2d Cir. 2018) (noting that the area in front of the shed at issue "was just a few steps from Alexander's back door" and explaining that "the area '"immediately surrounding and associated with the home"' is the very definition of curtilage." (citing *Jardines*, 569 U.S. at 6)); *Gebhardt v. State*, 307

Ga. 808, 809-10 (301 SE2d 633) (1983) (concluding that a driveway on the dwelling owner's property "is properly considered within the curtilage of the dwelling it services"). Because we conclude that the truck remained in the curtilage after it was moved, the fact that it was moved does not affect the Fourth Amendment analysis here (as it might had the truck been moved from outside of the curtilage into the curtilage, or vice versa). Cf. *Albert v. State*, 155 Ga. App. 99, 100 (270 SE2d 220) (1980) (noting that the vehicle, which the court held was permissibly searched as within the service station's curtilage, "had moved onto the curtilage shortly before the police officers arrived").

Ga. 587, 599 (837 SE2d 318) (2019) ("'Curtilage' has been defined [by this Court] as 'the yards and grounds of a particular address, its gardens, barns, and buildings.'" (citation omitted)); *Arp v. State*, 327 Ga. App. 340, 343 (759 SE2d 57) (2014) ("[T]he yard immediately surrounding one's dwelling is well within the curtilage."). See also *United States v. Reilly*, 76 F3d 1271, 1277 (2d Cir. 1996) ("[C]urtilage may reach a larger area in a rural setting.").

The relative seclusion of the area also supported treating it as curtilage. Although the area was not within a fence, the truck's parking area and the home were all bordered by trees, which created a natural barrier separating the home and the truck's parking area from the road and surrounding area. See *Reilly*, 76 F3d at 1277-1279 (explaining that natural barriers, such as hedgerows and thick woods, can "satisfy the requirements of an enclosure" and that the property owner "had planted trees along the perimeter of the property to block visibility"); *Daughenbaugh v. City of Tiffin*, 150 F3d 594, 599 (6th Cir. 1998) (explaining that several courts "have considered natural enclosures to be compelling evidence" and noting

26

that the garage at issue was "within natural boundaries demarcated by the river and the heavy tree coverage"). No barrier separated the truck from the home. See *Reilly*, 76 F3d at 1278 (explaining that the lack of an internal fence between the residence and the area at issue supported the district court's conclusion that the area was within the curtilage).

Altogether, this evidence supports the trial court's conclusion that Peacock's truck was parked in an area "immediately surrounding and associated with the home," *Jardines*, 569 U.S. at 6. So the trial court did not abuse its discretion in concluding that his truck sat in the curtilage when it was searched. And as a result, the court did not err in denying Peacock's motion to suppress the search of his truck.

4. Peacock contends that his trial counsel provided ineffective assistance by failing to argue that some of the statements Peacock made during his interview with Agent Seacrist should have been suppressed on the ground that they were induced by a hope of benefit. See OCGA § 24-8-824. To prevail on this claim, Peacock

27

must show both that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Ward v. State*, 313 Ga. 265, 272 (869 SE2d 470) (2022) (citation and punctuation omitted). "Where, as here, [a defendant] claims that trial counsel was deficient for failing to file a motion to suppress, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Evans v. State*, 308 Ga. 582, 586 (842 SE2d 837) (2020) (citation and punctuation omitted).[13]

A confession is not admissible if it was "induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. The "'slightest hope of benefit' refers to promises related to reduced criminal punishment—a shorter sentence, lesser charges,

---

[13] We reject the State's argument that counsel actually sought to suppress Peacock's statements based on an alleged hope of benefit. Before trial, Peacock's counsel moved to suppress statements from the interview on the grounds that they "were the result of coercive interrogation techniques," were "made in the absence of counsel and without an intelligent or knowing waiver of counsel," and were not voluntary under the totality of the circumstances. These contentions did not encompass a hope of benefit argument. See *Matthews v. State*, 311 Ga. 531, 542 (858 SE2d 718) (2021) (distinguishing the question of voluntariness determined by the totality of the circumstances from the question of whether the defendant was given an improper hope of benefit).

or no charges at all." *Henderson v. State*, 310 Ga. 708, 712 (854 SE2d 523) (2021) (cleaned up). By contrast, that phrase does not address law-enforcement tactics like "exhortations or encouragement to tell the truth" or "conveying the seriousness of the accused's situation." Id.

Here, Peacock highlights three parts of his interview to show that he was offered an improper hope of benefit, but none fits that description.

First, Peacock points to Agent Seacrist's statement, "even if I find something else out there that corroborates what you're telling me now, right, you're still going to catch a charge if I find it on my own." He characterizes this as an implied promise that Peacock would not "catch a charge" if he helped with the investigation, but context shows otherwise. Agent Seacrist made this statement shortly after he arrested Peacock for the murders and "pretty much . . . guarantee[d]" him that "there are more charges coming." Together, these statements conveyed that charging decisions would be made based on the evidence the agent found. Statements that a

29

person "could face different potential charges depending on what had occurred" and "had an opportunity to help himself out by telling the truth" do not offer an improper hope of benefit. *Clay v. State*, 309 Ga. 593, 597 (847 SE2d 530) (2020). See also, e.g., *Dawson v. State*, 308 Ga. 613, 620 (842 SE2d 875) (2020) (holding that the statements, "Maybe there's a different explanation for this. Maybe the right charge isn't murder. . . . I don't know. But until you straighten it out for me, you're on the hook for murder," did not offer improper hope of benefit).

Second, Peacock points out that Agent Seacrist told him, "let me be the one that works this out for you. Don't let it end this way." That, he says, was an implied promise that the agent could affect the number of charges or the degree of punishment. Again, context matters, and in context, this statement did not convey an improper promise. Agent Seacrist went on to say, "[t]his is not where this goes from here, Jeffrey. Just like I said from the beginning, I never intended for this to be sitting right here, I never intended for you to be getting all that hate. Only you can fill it in and do the right thing."

30

We have regularly rejected arguments that similar statements offered an improper hope of benefit. See, e.g., *Rogers v. State*, 289 Ga. 675, 678-679 (715 SE2d 68) (2011) ("'An interrogator's statement to an arrestee to "help yourself out" is an encouragement to tell the truth and does not constitute an impermissible hope of benefit.'" (citation omitted)); *Pittman v. State*, 277 Ga. 475, 478 (592 SE2d 72) (2004) (holding that the detective's "urg[ing] Pittman to tell the truth so that he could 'work this'" was not an impermissible hope of benefit).

Third, Peacock points to Agent Seacrist's "invocation of religion," which included repeating that the Bible "say[s] [t]he truth will set you free," telling him that a Bible had survived the fire, and praying with Peacock. But Peacock does not explain how these statements offered any hope of a reduced criminal punishment, either by themselves or combined with any of the other statements he highlights. See *Huff v. State*, 299 Ga. 801, 803-804 (792 SE2d 368) (2016) (holding that the investigators' statement "the truth will set you free" did not provide an improper hope of benefit). And "[t]he

31

fact that a confession has been made under a spiritual exhortation . . . shall not exclude it." OCGA § 24-8-825.

Given the above, a motion to suppress Peacock's interview on this ground "would not clearly have succeeded, and his trial counsel was not ineffective in failing to make such a motion." *Ward*, 313 Ga. at 275.

5. Peacock finally contends that his convictions and sentences for the three animal cruelty counts should have been for misdemeanors, not felonies, citing the rule of lenity. But the rule of lenity does not apply here. That rule "applies when a statute, or statutes, establishes, or establish, different punishments for the same offense, and provides that the ambiguity is resolved in favor of the defendant, who will then receive the lesser punishment." *Smallwood v. State*, 310 Ga. 445, 451 (851 SE2d 595) (2020) (citation and punctuation omitted). The felony offense of aggravated cruelty to animals and the misdemeanor offense of cruelty to animals are *different* offenses. Although both offenses criminalize causing the death of an animal, the first requires that a person do so

"[m]aliciously," OCGA § 16-12-4 (d) (1), and the second does not, see OCGA § 16-12-4 (b) (1). When "the two defined crimes do not address the same criminal conduct, there is no ambiguity created by different punishments being set forth for the same crime, and the rule of lenity does not apply." *Banta v. State*, 281 Ga. 615, 618 (642 SE2d 51) (2007). Peacock was properly sentenced based on the crimes of which the trier of fact found him guilty.

*Judgment affirmed. All the Justices concur.*

Decided September 7, 2022 — Reconsideration denied October 4, 2022.

Murder. Colquitt Superior Court. Before Judge Hardy.

*Matthew K. Winchester; McLendon Law Firm, Jason M. McLendon*, for appellant.

*Bradfield M. Shealy, District Attorney, Michelle T. Harrison, James L. Prine II, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Meghan H. Hill, Assistant Attorneys General*, for appellee.