318 Ga. 706
FINAL COPY

S23A1063. PUGH v. THE STATE.

BETHEL, Justice.

Andre Pugh was convicted of the malice murder of his wife Tiffany Jackson-Pugh and possession of a firearm during the commission of a felony.[1] In this appeal, Pugh contends that the trial court erred by denying his motion to suppress evidence obtained pursuant to a search warrant for his cell phone records, that trial counsel was ineffective for failing to raise a particularity challenge to the same search warrant, and that motion-for-new-trial counsel

---

[1] The crimes occurred on November 23, 2014. On February 16, 2016, a Fulton County grand jury indicted Pugh and co-indictee Adrian Earl Harley for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), conspiracy to commit murder (Count 4), and possession of a firearm during the commission of a felony (Count 5). Pugh was tried alone before a jury from September 24 to October 5, 2018, and was found guilty of all counts. The trial court sentenced Pugh to serve life in prison without the possibility of parole on Count 1 and five years on Count 5, to run consecutively to Count 1. The remaining counts were vacated or merged. On October 23, 2018, Pugh, through new counsel, filed a timely motion for new trial, which he amended on December 18, 2020. Following a hearing, the trial court denied the motion, as amended, on April 18, 2023. Pugh thereafter filed a timely notice of appeal. The case was docketed to this Court's August 2023 term and submitted for a decision on the briefs.

was ineffective in various respects. Concluding that these claims are meritless, we affirm.

1. The evidence presented at Pugh's trial showed the following. Around 6:00 a.m. on November 23, 2014, Tiffany was shot and killed while asleep in her bed at the Pughs' East Point residence. At 6:05 a.m., Pugh called his boss to report that someone had broken into his home. Pugh's boss drove to Pugh's home, and when he arrived, Pugh indicated that he had not been inside the residence but had noticed a suspected intrusion upon his return from overnight employment. At approximately 6:15 a.m., Pugh called 911 and informed the operator that he was at the residence, the garage door was open, and a downstairs window was broken. He told the operator that Tiffany had been murdered but again claimed that he had not been inside the home.

When responding officers arrived, Pugh was outside the home, waving his arms, and exclaiming, "My kids are in there. She's not picking up the phone." Pugh stated that he received a call from ADT, his alarm-service provider, alerting of a break-in at the residence.

2

Pugh further noted that the garage door and a rear window were open. Pugh also called a neighbor early that morning while "it was still dark" to report that someone broke into the house, that "they hurt Tiffany," and that Pugh thought Tiffany was dead.[2]

Upon entering the house, officers found Tiffany in bed in the main-level bedroom; she was bleeding from a gunshot wound to her left eye, which was "obviously swollen and oozing," and had no pulse.[3] Her crying toddler was sitting on her chest; two older children were asleep in an upstairs bedroom. Officers found the basement door and storm door unlocked, a basement window open with its screen cut, and the gate to the back yard open; during a sweep of the house, they found nothing else of interest.

That morning, Pugh, whom law enforcement did not yet consider a suspect in Tiffany's murder, provided a statement to

---

[2] A precise timeline for this conversation was not clearly established at trial. But, immediately following the call, the neighbor dressed and walked from two doors down to the Pugh residence where he found police already on the scene.

[3] A subsequent autopsy revealed that Tiffany was shot twice, once in the left eye and once near the left breast; the gunshot wound to the head was determined to be the cause of her death.

police, a video-recording of which was played at trial. According to Pugh, he left work around 5:15 a.m., and, sometime between 5:30 a.m. and 5:50 a.m. while driving home, he missed a call from ADT. Pugh returned the call and requested that ADT turn off the alarm so as not to disturb his children. Pugh stated that, upon arriving at home, he went inside to find the alarm still armed. When he turned on a light in Tiffany's bedroom, he "just saw a body," but he claimed that he did not notice any blood and that she appeared to be sleeping. He also claimed that he did not try to wake Tiffany because he was "scared." Pugh then went downstairs and found broken glass. Pugh stated that he told responding officers that he could not find his son and that his wife was not moving. When asked why he left his children inside the home despite signs of an apparent break-in, Pugh responded that he did not want to wake the older children and that he was unable to find his son.

During the interview, Pugh expressly stated that he had only one cell phone; the next day, however, investigators learned that Pugh in fact had a second cell phone. Thereafter, officers secured

4

search warrants to obtain the records for both phone numbers from Sprint, the cell-service provider, as well as for a tower dump of phone numbers used on the Sprint cell phone tower near Pugh's residence around the time of the crime. By cross-referencing phone numbers appearing in the tower dump with those in Pugh's contact list, investigators identified co-indictee Adrian Harley as a person of interest.[4] Data from Pugh's and Harley's cell phones showed that both phones were near the residence just before the murder and that several calls were exchanged between the phones.

Investigators also obtained security footage from Pugh's and a neighbor's[5] residences around the time of the murder, which investigators determined occurred at approximately 5:58 a.m. The footage showed two vehicles on the street and in the cul-de-sac near Pugh's residence shortly before the murder. One vehicle, which had a non-operative driver-side parking light, first passed the neighbor's

---

[4] At the time of the crimes, Pugh worked as a disc jockey at Club Onyx, an adult entertainment club. Harley, Pugh's long-time friend, was employed as his assistant.

[5] The neighbor testified that he lived two houses down from the Pugh residence.

residence at 4:50 a.m., corresponding to Harley's phone records placing him in Pugh's neighborhood at 4:49 a.m. That same vehicle pulled into the cul-de-sac about ten minutes before the murder, where it remained parked for several minutes. At 5:57 a.m., the vehicle's headlights flashed, and a second vehicle pulled alongside it. At 5:58 a.m., the vehicle with the non-operative parking light moved forward and stopped in front of Pugh's house for two or three minutes; the other vehicle drove away. Security footage showed that, soon thereafter, a light came on in the rear of the residence. Also at 5:58 a.m., Pugh received a phone call from ADT. Investigators later determined that the vehicle with the non-operative parking light matched the appearance of Harley's vehicle, which also had a non-operative driver-side parking light.

At trial, the State presented evidence undermining Pugh's various stories about his actions on the morning of Tiffany's murder. Records from ADT showed that ADT called Pugh at 5:58 a.m. and that Pugh returned the call at 6:03 a.m., contradicting Pugh's claim that the call regarding the triggered alarm came between 5:30 a.m.

and 5:50 a.m. Surveillance footage showed that, upon parking and exiting his vehicle in front of the home, Pugh in fact did not enter the home in the manner he described and instead waited for the police outside, despite his fairly detailed statement to the contrary.

The State also presented significant evidence of Pugh and Tiffany's marital difficulties and impending divorce. In September 2014, Tiffany consulted a divorce attorney, made plans to move out of the marital residence on December 1, and intended to file for divorce. According to Pugh's boss, Pugh was angry with Tiffany for wanting a divorce. Text messages between Pugh and Tiffany reflected discord in the relationship. Five days before the crimes, Pugh texted Tiffany, "I won't let you leave me now or never." Tiffany responded that she took the statement "as a threat." In other text messages found on Pugh's phone, Pugh engaged in sexually explicit conversations with multiple women, exchanged sexually explicit photographs with other women, and stated that he cheated on Tiffany every time she was out of town. In addition, a co-worker of Tiffany's with whom she had a romantic relationship in the weeks

7

before her death testified regarding Pugh's suspicions about that relationship. Pugh's boss testified that Pugh placed a second phone in Tiffany's vehicle to use as a GPS tracker because Pugh had been "speculating" that Tiffany "was possibly cheating" and that Pugh had previously sent Harley to the marital residence to lock Tiffany out of the home.

Evidence of Pugh's financial motive for the murder was also a prominent focus of the State's case, with text messages showing that Pugh would be unable to maintain the marital home following the divorce. Within 36 hours after Tiffany's murder, Pugh reported to his boss that he went to the social security office to "find out how much — what he can get for the passing of his wife" and that, "based upon what social security told him, he was going to be able to maintain paying his mortgage." And a family friend testified that, before Tiffany's funeral, Pugh sought her help in contacting Tiffany's employer's benefits provider. Finally, the State presented testimony regarding Pugh's unusual conduct and demeanor in the wake of Tiffany's murder, particularly his general lack of emotion

8

and apparently contrived expressions of grief.

2. On appeal, Pugh challenges the trial court's denial of his motion to suppress evidence obtained pursuant to a search warrant for his cell phone records. As he did below, Pugh argues that the warrant application failed to establish probable cause to believe that he had committed a crime or that evidence of such crime would be found in the phone records. He also asserts for the first time on appeal that the warrant authorized the seizure of items for which there was no probable cause and, thus, was overbroad. And in a related claim, Pugh contends that trial counsel was ineffective for failing to challenge the warrant on particularity grounds.

(a) The search warrant at issue was obtained by Sergeant Allyn Glover on November 24, 2014, the day after the crimes. The affidavit submitted in support of the search warrant application identified the place to be searched as "Records of Sprint Phone Number [Ending] -7281,"[6] indicated that the search warrant was sought in

---

[6] Though Pugh complains that the affidavit mentions neither the -7281 phone number nor Sprint, he overlooks the enlarged, bold heading which reads "Records of Sprint Phone Number [Ending] -7281."

connection with the offense of murder, and recited the following

factual basis:

On November 23rd 2014 at approximately 0616 hours, East Point Police was dispatched to 3782 Lake Haven Way, East Point, Fulton County, GA in reference to a trouble unknown call. Prior to their arrival, East Point Police Communications advised that they had previously received an alarm call from that location at 0558 hours, but the alarm was cancelled shortly thereafter. Communications advised that the resident, Mr. Andre Pugh would be standing by in front of the residence and that he noted damage to a rear window. Upon officers arrival, they were met by Mr. Pugh, who was waving his arms in the middle of the street continually stating "my kids are in there! She's not picking up the phone."

Officers entered the residence and located a female victim laying on the bed, on her back, partially covered up by a blanket with an apparent gunshot wound to the left eye. A small child was seen straddling the deceased victim.

Mr. Pugh stated that he was not at the residence during the incident and came home as a result of being notified by ADT of his house alarm going off. Mr. Pugh later stated that he missed a phone call from ADT and then returned their call. Upon arrival to the residence, Mr. Pugh advised that he looked in on his wife and saw her in the bedroom, though he didn't see any blood (though the victim had visible blood coming from her head). He then looked in on his kids and then went downstairs to see the broken glass and then went outside the residence to make phone calls; thus, leaving his wife and two children inside the residence. It is believed that

this phone would contain evidence in reference to this crime to include but not limited to GPS data, call logs, texts, etc.

The affidavit also detailed Sergeant Glover's experience in law enforcement.

The search warrant itself identified the place to be searched as "Records of Sprint Phone Number [Ending] -7281" and authorized the seizure of the following categories of items:

[1] Subscriber information, credit information, account comments, billing records from November 6th 2014 through present (or up to time phone may have been turned off)[;]
[2] Detailed inbound and outbound call lists from and to above dates to include call origination and termination location[;]
[3] Cell site tracking reference above dates[;]
[4] Physical address of cell sites and RF coverage map[;]
[5] All incoming and outgoing text messages detail and text message content for above dates[;]
[6] Subscriber information on any cellular numbers that the above number dialed or received calls from that belong to Sprint[;]
[7] All stored communications or files, including voice mail, email, digital images, buddy lists, and any other files associated with user accounts identified with account listed[;]
[8] Any other records or accounts, including archived records related or associated to the above referenced names, user names, or accounts and any data field name

definitions that describe these records[;]

[9] Any GPS location history available[;]

[10] Any other information pertaining to this phone number[;]

[11] Address books and calendars;

[12] Audio and video clips related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

[13] Call histories and call logs related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

[14] Photographs and associated metadata related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

[15] E-mail messages and attachments, whether read or unread and related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s)[;]

[16] Internet World Wide Web (WWW) browser files including, but not limited to, browser history, browser cache, stored cookies; browser favorites, auto-complete form history and stored passwords;

[17] Global position system (GPS) data including, but not limited to coordinates, way points and tracks for the previous 5 days;

[18] Documents and other text based files related to the above described criminal activity and further described in this affidavit in support of the search warrant, for the above described item(s);

which is being possessed in Violation of O.C.G.A. 16-5-1 Murder[.]

Pugh filed a pre-trial motion to suppress, which summarily asserted that the search warrants[7] were "insufficient on their face and there was not probable cause for their search." Pugh sought suppression of "all the records searched and seized, and all information derived therefrom." At a hearing, Pugh argued that the affidavit lacked probable cause because "[t]he facts therein do not do anything besides give rise to speculation o[r] conjecture about Mr. Pugh's involvement in the death of his wife." Pugh contended that "[a]ll [investigating officers] knew at that time is Pugh's wife was dead. She was shot; that's it. Pugh was outside. They didn't like the way he was reacting, but that's it. They had nothing else." The trial

---

[7] The motion also addressed a second search warrant obtained by Sergeant Glover for "Records of Sprint Phone Number [Ending] -2985." While Pugh's brief references the search warrants for both phone numbers, his arguments on appeal concern only the search warrant for the -7281 phone number. Under these circumstances, Pugh has abandoned any claim concerning the validity of the search warrant for the -2985 phone number. See former Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned." (applicable to Pugh's brief based on its filing date)). See also *Moon v. State*, 312 Ga. 31, 57 (4) n.12 (860 SE2d 519) (2021) (deeming abandoned under former Rule 22 unsupported argument that search warrant was invalid). We note that Pugh concedes that "nothing of evidentiary value was discovered" in the records for the -2985 phone number.

court denied the motion, and later entered a written order finding that the issuing magistrate "had a substantial . . . basis" for finding that "probable cause existed for each search warrant." Against this procedural backdrop, we turn to Pugh's claims on appeal.[8]

(b) Pugh first contends that the affidavit for the search warrant failed to establish probable cause to support the issuance of the warrant and that the trial court therefore erred by denying his motion to suppress. We disagree.

The Fourth Amendment to the United States Constitution demands that "no Warrants shall issue, but upon probable cause."

---

[8] We note that, in the trial court, the State argued that a good-faith exception to the exclusionary rule should apply to preclude suppression of the evidence seized pursuant to the warrant, though the State also acknowledged that "Georgia has historically not recognized the good-faith exception." See *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992) (construing OCGA § 17-5-30 to hold that Georgia does not recognize the good-faith exception to the exclusionary rule established in *United States v. Leon*, 468 U. S. 897 (104 SCt 3405, 82 LE2d 677) (1984)). The State has not reasserted this argument on appeal, nor has it asked this Court to overrule *Gary*. Cf. *State v. Ledbetter*, 318 Ga. 457, 481 (899 SE2d 222) (2024) (Peterson, P. J., concurring specially, joined by Boggs, C. J., and LaGrua, J.) (criticizing *Gary*'s holding and urging this Court to overrule *Gary*); id. at 480 (Bethel, J., concurring, joined by Warren, McMillian, and Pinson, JJ.) (agreeing with "the concerns raised in Presiding Justice Peterson's special concurrence" and opining that "the 'mess' [arising from *Gary*] the Presiding Justice describes is due to be cleaned up").

There must be probable cause to believe both "that a crime is being committed or has been committed" and "that contraband or evidence of a crime will be found in a particular place." *State v. Britton*, 316 Ga. 283, 286 (1) (888 SE2d 157) (2023) (citations and punctuation omitted). Whether there is probable cause to issue a search warrant is a question directed in the first instance to the magistrate. And in assessing whether probable cause exists, the magistrate simply must make "a practical, common-sense decision," based on "all the circumstances set forth in the affidavit before him," whether there is "a fair probability" that the particular place to be searched contains the items to be seized — that is, evidence of a crime. *Copeland v. State*, 314 Ga. 44, 49 (3) (875 SE2d 636) (2022) (citation and punctuation omitted).

Probable cause is "not a high bar," *District of Columbia v. Wesby*, 583 U. S. 48, 57 (III) (138 SCt 577, 199 LE2d 453) (2018) (citation and punctuation omitted); it requires merely a fair probability — "less than a certainty but more than a mere suspicion of possibility — which by no means is to be equated with proof by

15

even so much as a preponderance of the evidence," *Copeland*, 314 Ga. at 49 (3) (citation and punctuation omitted). Thus, our duty as a reviewing court is to determine "whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Glenn v. State*, 302 Ga. 276, 281 (III) (806 SE2d 564) (2017). And we bear in mind that a magistrate's decision to issue a search warrant upon a finding of probable cause is afforded "substantial deference," and "[e]ven doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." Id. (citation and punctuation omitted).

Pugh says the facts in the affidavit are lacking and fail to show that evidence of a crime would be found in his phone records. In Pugh's view, the facts in the affidavit do not tie the phone records to the investigation of Tiffany's murder and do not connect the -7281 phone number to Pugh or to the phone he possessed at the time of the murder. Pugh is correct that the affidavit does not expressly tie the phone records to the murder investigation or connect the target phone number to Pugh, but that does not necessarily defeat a finding

16

of probable cause. We judge the affidavit supporting a search warrant "on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F3d 970, 975 (III) (6th Cir. 2000). Thus, in assessing probable cause, we take reasonable inferences into account. See *Britton*, 316 Ga. at 286 (1). Considering the totality of the circumstances outlined in the affidavit, the magistrate was authorized to make "certain common-sense conclusions about human behavior," *Illinois v. Gates*, 462 U. S. 213, 231 (III) (103 SCt 2317, 76 LE2d 527) (1983), and infer that Pugh was somehow involved in Tiffany's murder, that evidence of his location and communications in the time surrounding the murder might be found in his cell phone records, and that the target phone number belonged to Pugh. See *State v. Ledbetter*, 318 Ga. 457, 468 (2) (899 SE2d 222) (2024); *Taylor v. State*, 303 Ga. 57, 61 (2) (810 SE2d 113) (2018).

Here, the affidavit provided facts about Tiffany and her connection to Pugh, including that she and Pugh were married, that they had children, and that the family resided together. The

17

affidavit also described Pugh's conduct and his interactions with police, including what could be viewed as the very unusual decision, made under the purported belief that an intruder had broken into his home, to leave his sleeping wife and children in the home while he waited outside. As detailed in the affidavit, Pugh's behavior was flatly inconsistent with his frantic cries to the first responding officers about his kids being in the home and Tiffany not answering her phone. Further, Pugh's own account of returning home and his claim that he did not notice Tiffany bleeding were contradicted by physical evidence at the scene. And while a window of the residence was damaged, the fact that the sounding alarm was quickly deactivated indicated that whoever entered the residence, and presumably killed Tiffany, had knowledge of the alarm code. Taken together, Pugh's implausible behavior, his relationship with the victim and connection to the residence where the crime occurred, the inconsistency between his statement and the evidence at the scene, and evidence suggesting that the crime was committed by someone familiar with the residence's alarm code showed a fair probability

18

that Pugh was involved in Tiffany's murder. See *Wesby*, 583 U. S. at 59 (III) (A) ("Based on the vagueness and implausibility of the [suspects'] stories, the officers could have reasonably inferred that they were lying and that their lies suggested a guilty mind."); *United States v. Ameling*, 328 F3d 443, 449 (8th Cir. 2003) (A suspect's "apparently false statements and inconsistent stories," in the totality of the circumstances, can provide probable cause that he was "involved in criminal conduct.").

Not only did the affidavit support the inference that Pugh had some involvement in Tiffany's murder, it also offered a substantial basis for the magistrate to conclude that a fair probability existed that Pugh's cell phone records would contain evidence of the crime. The facts in the affidavit indicated that Pugh was using his cell phone around the time of the murder — he reported missing the initial call from ADT, he indicated to police that he had attempted to call Tiffany but that she failed to answer, and he said he made phone calls while waiting on police to respond to the residence. From these facts, the magistrate could reasonably infer that Pugh's cell

19

phone records would contain information about his communications and whereabouts around the time of the crime, which, logically, could provide evidence of his involvement in Tiffany's murder. Indeed, Sergeant Glover averred as much; after detailing his experience and training and Pugh's conduct at the scene, including making several phone calls, he indicated his belief that "this phone" would contain evidence related to the crime,[9] including "but not

---

[9] Pugh takes issue with this statement, arguing that "[m]ere belief or suspicion is never enough to support a search warrant." But the affidavit at issue here is not remotely comparable to the bare-bones affidavits entirely devoid of facts that were found insufficient in the cases upon which Pugh relies. Specifically, Pugh points to *Nathanson v. United States*, 290 U. S. 41, 44, 47 (54 SCt 11, 78 LE 159) (1933) (holding insufficient affidavit which stated *only* that the affiant "has cause to suspect and does believe" that "[c]ertain liquors of foreign origin" illegally brought into the United States were located at a particular premises); *Smoot v. State*, 160 Ga. 744, 746-747 (128 SE 909) (1925) ("The affidavit is based only upon the statements of the affiant that 'he has reason to believe that a quantity of intoxicating liquor is in the dwelling-house of [appellant], and verily believes upon probable cause that the intoxicating liquor is kept in violation of the laws of the State of Georgia.' . . . [I]t is apparent from the affidavit that no fact which would have afforded the basis for a legal conclusion of probable cause was before the court[.]" (punctuation omitted)); and *Johnson v. State*, 111 Ga. App. 298, 302 (1) (b), 305 (1) (c) (141 SE2d 574) (1965) ("Certainly, since no facts of any kind were stated in the affidavit, it was deficient in this respect. . . . Does the recital in the warrant, 'evidence having been submitted to me to show probable cause,' meet the requirement? . . . Obviously not."). Pugh's complaint that Sergeant Glover believed evidence would be found on "this phone," rather than phone records, is also unavailing, as such "hypertechnical" assessments have no place in the test for probable cause. See *Gates*, 462 U. S. at 236 (III) ("[C]ourts should not

20

limited to GPS data, call logs, texts, etc." See *United States v. Floyd*, 740 F3d 22, 35 (II) (B) (3) (1st Cir. 2014) ("[A] law enforcement officer's training and experience may yield insights that support a probable cause determination.").

Though Pugh complains that the -7281 phone number was not explicitly connected to him or to the phone he possessed at the time of the murder, this argument fails. As we recently explained in rejecting a similar claim in *Ledbetter*, 318 Ga. at 473 (2) (a) (i), the absence of an express connection, "by itself, is not a fatal flaw" and, as with other questions of probable cause, requires the reviewing court to consider "all the circumstances" presented in the affidavit to determine whether the magistrate could have inferred the necessary link. Here, as in *Ledbetter*, the affidavit indicated that law enforcement had an opportunity to learn Pugh's phone number by noting that Pugh made multiple statements to police regarding his phone use around the time of the crime. See *Ledbetter*, 318 Ga. at

---

invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." (citation and punctuation omitted)).

478 (2) (b) (i). Pugh's was the only name mentioned in the affidavit, he was the focus of the affidavit's narrative, and only one phone number was referenced in the affidavit. See *Taylor*, 303 Ga. at 62 (2) (rejecting argument that warrant was not supported by probable cause for failure to expressly state that address to be searched was appellant's address because, in light of other information in the affidavit, "the magistrate, making a practical and common-sense decision, was entitled to infer that there was a 'fair probability' that [appellant] lived at" the target address); *United States v. Hunter*, 86 F3d 679, 682 (I) (7th Cir. 1996) (although affidavit did not explicitly state that address to be searched was appellant's residence, "that is the only logical conclusion supported by a common-sense reading of the affidavit," which "referred four times to [appellant's] residence" and "made no reference to any other place connected to [appellant]"). Moreover, "[t]here was nothing in the affidavit . . . to lead the magistrate to believe that the . . . phone number[ ] [was] associated with" anyone other than Pugh. *Ledbetter*, 318 Ga. at 474 (2) (a). While it would have been helpful to include the fact that Pugh used

the -7281 phone number, see id. at 474-475 (2) (a) (i) and n.24 (noting that "argument on this point would have been more easily resolved if the drafter of the warrant had taken the small, but important, extra step of expressly linking" the target phone number to the user and "encourag[ing] law enforcement to provide such information on the face of the warrant application or affidavit"), we conclude, in light of all the circumstances, that the affidavit nevertheless provided the issuing magistrate with sufficient information from which the magistrate could reasonably infer that the -7281 phone number belonged to Pugh. For all these reasons, we conclude that the magistrate had a substantial basis for finding that probable cause existed to issue the search warrant, and this claim fails.

(c) Pugh next asserts, for the first time on appeal, that the affidavit failed to establish probable cause to search for and seize certain categories of evidence specified in the search warrant. Because Pugh did not challenge the warrant on this basis in the trial court, we review only for plain error. See *Williams v. State*, 315 Ga. 490, 494-495 (2) (883 SE2d 733) (2023) (applying plain-error review

23

to particularity challenge to search warrant where appellant did not move to suppress evidence procured by the warrant on that basis in the trial court). To establish plain error, Pugh must demonstrate that the alleged error was not "affirmatively waived"; was "clear or obvious, rather than subject to reasonable dispute"; "affected [his] substantial rights," meaning that "it affected the outcome of the trial court proceedings"; and "seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Hampton v. State*, 302 Ga. 166, 167 (2) (805 SE2d 902) (2017) (citation and punctuation omitted). "Satisfying all four prongs of this standard is difficult, as it should be." Id. at 168 (2) (citation and punctuation omitted).

Pugh contends that the scope of the items to be seized under the warrant "exceed[ed] the facts justifying" the warrant's issuance. The thrust of Pugh's argument, as we understand it, is not that the warrant was an unconstitutional general warrant but that it contained some overly broad provisions that authorized the seizure of items for which there was no probable cause.

The Fourth Amendment, besides requiring probable cause to

issue a search warrant, requires "probable cause to seize the particular things named in the warrant." *United States v. Sanjar*, 876 F3d 725, 735 (II) (5th Cir. 2017) (citation and punctuation omitted); see *Reaves v. State*, 284 Ga. 236, 237 (1) (b) (664 SE2d 207) (2008) ("[W]hether probable cause has been shown for the search for and seizure of the specific items" described in the warrant is "separate from the question" of whether there is probable cause "to believe that a certain crime has been committed and that there is a fair probability that 'evidence' of that crime will be located at the place specified[.]"). If those requirements are not met, an issue of overbreadth may arise. See *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F3d 137, 148-149 (IV) (A) (3rd Cir. 2002). A warrant suffering from overbreadth "describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause." Id. at 149 (IV) (A) (citation and punctuation omitted); see also *United States v. Williams*, 897 F2d 1034, 1039 (III) (10th Cir. 1990) (The "breadth of a warrant must be

justified by the breadth of the probable cause[.]" (citation and punctuation omitted)).

Critically, the inclusion of overly broad provisions does not necessarily doom the warrant in its entirety. See *United States v. Cotto*, 995 F3d 786, 798 (II) (B) (2) (10th Cir. 2021) ("[E]ven if the warrant at issue here is overbroad, suppression of evidence should be a last resort, not a first impulse." (citation and punctuation omitted)). In such cases, the warrant "can be cured by redaction, that is, by striking from the warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F3d at 149 (IV) (A).

With these principles in mind, we return our focus to Pugh's arguments on appeal. As an initial matter, Pugh does not argue that a warrant containing some overly broad provisions is necessarily wholly invalid. Nor does it appear that Pugh's overbreadth challenge concerns records of his communications and location, and, in fact, he

appears to concede that there was probable cause to seize such records. Instead, without identifying the specific provisions of the warrant with which he takes issue,[10] he complains that the items to be seized included "internet browser history, photographs and videos, documents and text-based files, unread emails, and much, much more," for which he says probable cause was lacking. Assuming without deciding that Pugh is correct that the warrant was overbroad in the respects he contends, his claim nonetheless fails on the third prong of plain error review because he has not shown harm from the inclusion of the allegedly overbroad portions of the warrant. See *Hampton*, 302 Ga. at 168 (2) (To prevail on the third step of the plain error analysis, an "appellant has the burden

---

[10] Pugh also notes that the affidavit referenced only "GPS data, call logs, and texts, etc.," while the warrant authorized the search for and seizure of a wider array of items. To the extent Pugh asserts that probable cause to search for and seize an item is established only if that item is specifically identified in the supporting affidavit, he is incorrect. See *Groh v. Ramirez*, 540 U. S. 551, 557 (II) (124 SCt 1284, 157 LE2d 1068) (2004) ("The Fourth Amendment[,] by its terms[,] requires particularity in the warrant, not in the supporting documents."); *United States v. Barajas*, 710 F3d 1102, 1109 (B) (1) (10th Cir. 2013) (rejecting argument "that [the] probable cause determination [for seizure of cell phone GPS data] hinges on the government's failure to specifically request GPS data" in the supporting affidavit).

27

to make an affirmative showing that the error probably did affect the outcome below." (citation and punctuation omitted)).

Specifically, Pugh has not shown that any evidence admitted against him at trial was seized solely pursuant to the allegedly overbroad portions of the warrant as opposed to the requests for communication and location records that we have already concluded — and that he has conceded — were supported by probable cause. Indeed, as far as we can tell — and Pugh does not argue otherwise — the only evidence obtained pursuant to the warrant that was later admitted at trial were records of Pugh's phone calls and text messages, as well as cell-site location information.[11] See *Cotto*, 995 F3d at 800 (II) (B) (2) (where warrant contained both valid provisions and overly broad provision but no evidence was seized pursuant to overly broad provision, none of the evidence obtained during the search should have been suppressed); *United States v. Timley*, 443 F3d 615, 623 (I) (8th Cir. 2006) (although warrant may

---

[11] Pugh does not argue that the seizure of this evidence led to the discovery of other evidence that was admitted against him at trial.

have been overbroad in certain respects, any failure to suppress seized evidence was harmless because warrant was sufficient "as to items seized that formed the basis for the criminal charges"); *United States v. Blakeney*, 942 F2d 1001, 1027 (I) (6th Cir. 1991) (where evidence "seized pursuant to the overbroad portion of the search warrant was not introduced into evidence," appellant "was not prejudiced by the defect in the warrant"). Further, although Pugh bears the burden of showing harm in the context of plain error review, see *Hampton*, 302 Ga. at 168 (2), it is not readily apparent to us, based on a comprehensive review of the record, what harm Pugh suffered as a result of this assumed error. For all these reasons, we conclude that this claim fails.

(d) In his final enumeration of error concerning the search warrant, Pugh contends that the warrant was insufficiently particularized such that it constituted a general warrant and that trial counsel was ineffective for failing to raise this claim below. For the reasons explained below, we cannot agree.

The Fourth Amendment requires a warrant to "particularly"

describe "the place to be searched, and the persons or things to be seized." The particularity requirement guards against the "specific evil" of the "general warrant," which was "abhorred by the colonists" and permitted "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U. S. 443, 467 (II) (C) (91 SCt 2022, 29 LE2d 564) (1971) (punctuation omitted). Pugh raises his particularity challenge through the lens of ineffective assistance of counsel. To succeed on this claim, Pugh bears the burden of showing both that trial counsel's performance was deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Pugh must show that his trial counsel performed his duties in an objectively unreasonable way. See id. at 687-690 (III) (A). To "eliminate the distorting effects of hindsight," we must consider Pugh's claim in light of "counsel's perspective at the time" and "indulge a strong presumption" that counsel's performance was reasonable. Id. at 689 (III) (A). Pugh "bears the burden of overcoming this presumption" by "show[ing]

30

that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Hurston v. State*, 310 Ga. 818, 825 (3) (854 SE2d 745) (2021) (citation and punctuation omitted). To establish prejudice, Pugh must show a reasonable probability that, but for counsel's deficient performance, the result at trial would have been different. See *Strickland*, 466 U. S. at 694 (III) (B).

In addition, "[w]here, as here, an appellant claims that trial counsel was deficient for failing to file a motion to suppress, the appellant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Tabor v. State*, 315 Ga. 240, 249 (3) (b) (882 SE2d 329) (citation and punctuation omitted). See also *Evans v. State*, 306 Ga. 403, 409 (2) (a) (831 SE2d 818) (2019) ("[T]rial counsel cannot be deficient for failing to file a meritless motion[.]"). In determining whether an appellant has carried his burden of making this showing, we ask whether a motion to suppress on the specific basis proposed by the appellant would "clearly have succeeded" had his trial counsel raised

31

it. *Ward v. State*, 313 Ga. 265, 275 (4) (b) (869 SE2d 470) (2022); see also *Reese v. State*, 317 Ga. 189, 201-202 (4) (a) (891 SE2d 835) (2023). Also relevant to our analysis is whether the appellant's argument was supported by binding appellate precedent at the time of trial. See *Hurston*, 310 Ga. at 829 (3) (b); *Esprit v. State*, 305 Ga. 429, 438 (2) (c) (826 SE2d 7) (2019) ("A criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (citation and punctuation omitted)). We conclude that Pugh has failed to make the required strong showing.

The substantive predicate of Pugh's claim appears to be that the warrant at issue here is analogous to the warrant we recently concluded was an invalid general warrant in *State v. Wilson*, 315 Ga. 613 (884 SE2d 298) (2023) (decided Feb. 21, 2023). In that case, we addressed a particularity challenge to a warrant that authorized a "forensic examination" of a cell phone for "any and all stored electronic information, including but not limited to" various

32

categories of electronic data. Id. at 613-614. Noting the warrant's "complete absence of limiting language," we agreed with the trial court that the warrant "authorized an impermissible general search of [the appellant's] cell phones" and, thus, affirmed the trial court's ruling suppressing evidence obtained pursuant to the warrant. Id. at 615-616. Pugh sees similarities between the warrant we held invalid in *Wilson* and the warrant at issue in this case, which he characterizes as "an illegal general warrant." Pugh says that, like in *Wilson*, the warrant in this case "essentially" permitted "an unlimited general search of information and records relating to the [target] phone number" and "authorize[d] the broadest possible search of the phone records for the most general categories of data imaginable."[12] Pugh's claim thus turns on our decision in *Wilson* and his assertion that the warrant in this case is as obviously general in nature as the warrant in *Wilson*.

As an initial matter, however, *Wilson* was decided more than

---

[12] Pugh does not argue that officers in fact conducted an unconstitutional general search.

four years after Pugh's 2018 trial, so his trial counsel would not have been able to rely on *Wilson* in challenging the warrant's compliance with the particularity requirement. See *Hurston*, 310 Ga. at 829 (3) (b). Although *Wilson* does not represent a change in the law on particularity, see *Wilson*, 315 Ga. at 616 (noting that "well-established legal precedent supports our conclusion that the trial court properly suppressed the cell phone evidence"), it is the first decision in which this Court applied the particularity requirement to invalidate a warrant that authorized a search of the entirety of electronic data contained on a cell phone and, thus, reflects an extension of existing precedent. And as we have explained before,

> when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, a new decision does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued.

*Walker v. State*, 306 Ga. 579, 583 (2) (a) (832 SE2d 420) (2019) (citation and punctuation omitted). Trial counsel therefore cannot "be deemed ineffective for failing to argue precedent that was not in

34

existence at the time of [the] trial." Id.

Moreover, Pugh has not clearly shown, through his nearly singular reliance on *Wilson*,[13] that a motion to suppress on the basis argued would have succeeded and, thus, has failed to make the required "strong showing that the damaging evidence would have been suppressed." *Reese*, 317 Ga. at 201 (4) (a) (citation and punctuation omitted). Whereas the warrant we considered in *Wilson* was, on its face, a general warrant — it *expressly* authorized the seizure, without limitation, of "any and all stored electronic information," *Wilson*, 315 Ga. at 613 — the warrant here appears to be of a different character. Indeed, this warrant "did not simply provide an unbounded description authorizing the search and seizure of any and all data on the cell phone," *Perez v. State*, 316 Ga. 433, 447 (3) (c) (888 SE2d 526) (2023), but, rather, identified 18 separate categories of items, many of which appear to be sufficiently

---

[13] In support of his claim of ineffective assistance, Pugh cites only *Wilson* and one other decision of this Court, both of which were issued after his trial. He also cites a decision of the District of Columbia Court of Appeals, which also was issued after his trial and, of course, is not binding on this Court.

particularized, while others appear significantly broader in scope. Further, unlike the warrant in *Wilson* and its "complete absence of limiting language," *Wilson*, 315 Ga. at 615, certain categories of the warrant in this case are limited by time or by reference to the specific crime under investigation, and additional categories appear to be directed not toward facilitating a limitless search of Pugh's cell phone but to obtaining business-type records from Sprint. In sum, taken as a whole, the warrant in this case is not as easily read as the warrant in *Wilson* as authorizing the seizure of all data without limitation on the target cell phone.

To be sure, certain portions of this warrant paint a broad stroke and raise questions about the sort of particularity required in warrants for the seizure of data contained on cell phones and of records held by cell-service providers. But it does not appear to us that *Wilson* alone can resolve these questions, and Pugh otherwise makes no effort to grapple with them. Nor does Pugh cite, and we have not found, any United States Supreme Court or Georgia appellate precedent that clearly held, at the time of Pugh's trial, that

a search warrant authorizing the seizure of a wide range of data from a defendant's cell phone and cell-service provider amounts to a general warrant under these circumstances. See *Hourin v. State*, 301 Ga. 835, 844 (3) (b) (804 SE2d 388) (2017) ("In evaluating the particularity of a warrant's description, we must determine whether the description is sufficient to enable a prudent officer executing the warrant to locate it definitely and with reasonable certainty. The degree of the description's specificity is flexible and *will vary with the circumstances involved*." (citations and punctuation omitted; emphasis supplied)). In short, whether this warrant constitutes a general warrant presents a difficult question, and it is not apparent to us that there is an obvious answer. We thus conclude that a motion to suppress "on the ground now proposed" by Pugh "would not clearly have succeeded," and his trial counsel was not deficient "in failing to make such a motion." *Ward*, 313 Ga. at 275 (4) (b); see also *Reese*, 317 Ga. at 201-202 (4) (a) (in the context of a different legal question that presented a similarly difficult legal analysis on the merits, identifying no deficient performance where appellant

failed to "clearly show" that a motion to suppress based on his proposed argument would have been successful). Compare *Bryant v. State*, 301 Ga. 617, 620 (2) (800 SE2d 537) (2017) (concluding that trial counsel was deficient for failing to raise particularity challenge to search warrant that "did not describe the items to be seized *at all*" (citation and punctuation omitted; emphasis in original)).

3. Finally, Pugh asserts that motion-for-new-trial counsel was constitutionally ineffective by failing to raise four claims of trial counsel's ineffectiveness. But these claims, which "simply recast his trial-counsel ineffectiveness claims as motion-for-new-trial ineffectiveness claims," are procedurally barred.[14] See *Robinson v. State*, 306 Ga. 614, 616 (2) (b) (832 SE2d 411) (2019). This Court has

> consistently held that a defendant cannot resuscitate a specific claim of ineffective assistance of trial counsel that was not raised at the motion for new trial stage by recasting the claim on appeal as one of ineffective

---

[14] In one claim, Pugh ostensibly challenges the manner in which motion-for-new-trial counsel pursued a "properly raised" claim of trial counsel ineffectiveness concerning the motion to suppress cell phone records, but the crux of Pugh's argument on appeal is that motion-for-new-trial counsel should have raised an additional or alternative claim of trial counsel ineffectiveness with respect to the motion to suppress. Accordingly, this, like Pugh's other claims of motion-for-new-trial ineffectiveness, is simply another attempt at improper bootstrapping.

assistance of motion-for-new-trial counsel for failing to raise the specific claim of trial counsel's ineffectiveness.

Id. at 617 (2) (b) (citation and punctuation omitted). See also *Elkins v. State*, 306 Ga. 351, 362 (4) (b) (830 SE2d 217) (2019); *King v. State*, 304 Ga. 349, 351 (818 SE2d 612) (2018). Accordingly, these claims, like the others, fail.[15]

*Judgment affirmed. All the Justices concur, except Peterson, P. J., who concurs specially.*

PINSON, Justice, concurring.

I concur fully in the Court's opinion. Relevant to Division 2 (d) of that opinion, I want to flag one important point about the Fourth Amendment's particularity requirement as applied to search warrants for cell phones, because it's going to come up again and again.

In *State v. Wilson*, 315 Ga. 613 (884 SE2d 298) (2023), we held

---

[15] If Pugh "wishes to pursue a claim that his post-conviction counsel was ineffective[,] he must do so through a petition for a writ of habeas corpus." *Robinson*, 306 Ga. at 617 (2) (b) n.5 (citation and punctuation omitted).

that the search warrant for cell phones in that case violated the Fourth Amendment's requirement that a warrant "particularly" describe "the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The problem with that warrant was not merely that it allowed police to search the entire contents of the cell phones. The problem was that the warrant allowed police to search the phones, seize every bit of data on them, and use anything they found against the defendant without regard for whether any of that data was evidence of the crime the defendant was accused of committing. See *Wilson*, 315 Ga. at 615-616; id. at 624 (Pinson, J., concurring). In other words, the warrant on its face authorized the long forbidden "general search[ ]": the "exploratory rummaging in a person's belongings" for unspecified evidence of unspecified crimes. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (II) (C) (91 SCt 2022, 29 LE2d 564) (1971), holding modified by *Horton v. California*, 496 U.S. 128 (110 SCt 2301, 110 LE2d 112) (1990); *Marron v. United States*, 275 U.S. 192, 195 (1) (48 SCt 74, 72 LE 231) (1927).

So *Wilson*'s takeaway was not that a search warrant for a cell

phone necessarily must list each specific kind or category of data the police may look through when they search the phone's contents. Just as specifying the address of a home can be particular enough to allow police to search rooms, closets, and cabinets throughout the home, identifying a specific cell phone as the "place to be searched" may well be particular enough to authorize police to look through the contents of the phone. See *United States v. Ross*, 456 U.S. 798, 820-821 (IV) (102 SCt 2157, 72 LE2d 572) (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."); *Peacock v. State*, 314 Ga. 709, 717 (3) (b) (878 SE2d 247) (2022) (noting "it is well settled that a search warrant for a home authorizes searching . . . containers" like "desks, cabinets, closets, or 'any other item of personal property' in which the items described in the search warrant might be stored" "without separately identifying them with particularity" (cleaned up)).

Instead, the point to take from *Wilson* is that a search warrant

41

for a cell phone also needs to tell the police, with sufficient particularity, *what they can look for* in their search of the phone. As we indicated in *Wilson*, the warrant must limit the object of the search to evidence of the crimes that the police have probable cause to believe the suspect committed. *Wilson*, 315 Ga. at 615-616; see id. at 617 (Peterson, P. J., concurring) (explaining the particularity requirement, when met, "means that the warrant allows the officer to identify the object of the search or seizure 'definitely and with reasonable certainty'"); *Westbrook v. State*, 308 Ga. 92, 97-98 (3) (a) & n.5 (839 SE2d 620) (2020) (holding ineffective claim based on failure to object to particularity of warrant was meritless because search warrant "enable[d] a prudent officer to know to look for photographs and videos" relating to the murder on the cell phone). And "evidence of murder" generally is not particular enough, although what further specificity is required will depend on the nature of the crimes in question and the circumstances of a particular case. See, e.g., *Groh v. Ramirez*, 540 U.S. 551, 554-555 (I), 557-559 (II) (124 SCt 1284, 157 LE2d 1068) (2004) (warrant was not

42

sufficiently particular when it authorized a search of defendant's house, and was based on probable cause to believe house contained illegal explosive weapons, but did not identify any items to be seized); *Bryant v. State*, 301 Ga. 617, 619-620 (2) & n.3 (800 SE2d 537) (2017) (warrant was not sufficiently particular when it authorized a search of defendant's house and cars, and stated there was probable cause to believe he had committed murder, but did not specifically identify any property, items, articles, or instruments to be searched for and seized); *Dobbins v. State*, 262 Ga. 161, 163-164 (3) (415 SE2d 168) (1992) (warrant was not sufficiently particular when it authorized seizure of "certain property and/or materials of a pornographic nature, to-wit, movies, pictures and magazines which are contrary to the laws of the State of Georgia," because it did not specify how or why the items were believed to be obscene but instead left that determination "entirely to the discretion of the officers executing the warrant").[16]

---

[16] Of course, another question lurking here is what police can do with something they find on a cell phone while searching for whatever the warrant

43

In short, under *Wilson*, a search warrant for a cell phone must identify with sufficient particularity both the cell phone that may be searched and the object of that search. Anything less will not hold up against a Fourth Amendment challenge.

With this understanding, I join the Court's opinion.

I am authorized to state that Justice Warren, Justice Bethel, and Justice McMillian join in this concurrence.

PETERSON, Presiding Justice, concurring specially.

The majority's analysis in Division 2 (b) regarding probable cause supporting the warrant at issue in this appeal represents a faithful application of Divisions 2 (a) (i) and 2 (b) (i) of our recent decision in *Ledbetter*. I did not join that division of *Ledbetter*, arguing that we should instead overrule our all-but-already-

---

authorizes them to search for—that is, whether police can seize and use nonresponsive data. As I noted in *Wilson*, we have not answered that question yet. *Wilson*, 315 Ga. at 628-629 & n.12 (Pinson, J., concurring) (citing Orin S. Kerr, Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data, 48 Tex. Tech L. Rev. 1 (2015)).

overruled precedent of *Gary v. State*, 262 Ga. 573 (422 SE2de 426) (1992) and resolve the issue by applying the *Leon* good faith exception. See *State v. Ledbetter*, 318 Ga. 457, 481 (899 SE2d 222) (2024) (Peterson, P. J., concurring specially). That remains my view, and so I similarly concur specially in Division 2 (b) today.

But I write separately today to express an additional concern. I am unconvinced by the *Ledbetter* majority's probable cause analysis. The probable cause required to support a valid warrant is probable cause to believe that evidence will be found at the place to be searched. The "place" to be searched in the warrants at issue in *Ledbetter* were phone numbers. There was nothing at all in the warrant affidavits about whose phones the numbers represented. For the reasons the majority pointed out in *Ledbetter*, I'm not certain that defeats probable cause. But I'm not certain it doesn't, either. It seems to me the only reasonable inference supported by the *Ledbetter* majority's reasoning is that the officers writing the affidavits subjectively believed the numbers to belong to people

named in the affidavits; without some detail in the affidavits explaining why they held that belief, I question whether it is reasonable to take the next step the majority essentially took, that of presuming from the fact of the officers' belief that such belief was itself supported by probable cause. We generally require warrant affidavits to provide detail from which a neutral magistrate can determine for themselves whether probable cause exists, rather than merely defer to the unexplained implicit belief of law enforcement. Because my concern about the majority's probable-cause analysis in *Ledbetter* applies equally to this case, I do not join the majority's application of that analysis here.

Making matters more difficult, little helpful federal precedent exists on this question, because under federal law federal courts rarely need to decide it because the *Leon* good faith exception virtually always applies. And until we finally erase the last traces of *Gary*, we'll have to keep deciding these difficult, fact-bound questions that federal law has rendered largely irrelevant.

Decided March 14, 2024 — Reconsideration denied March 27, 2024.

Murder. Fulton Superior Court. Before Judge Cox.

*Clark & Towne, David E. Clark; Sessions & Fleischman, Andrew S. Fleischman*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.